[No. B212933. Second Dist., Div. Eight. Feb. 1, 2011.]

TERESA D. GREEN, Plaintiff and Appellant, v.
LAIBCO, LLC, Defendant and Appellant.

COUNSEL

Law Offices of Gail D. Solo, Gail D. Solo; Law Office of Barry M. Wolf and Barry M. Wolf for Plaintiff and Appellant.

Horvitz & Levy, Barry R. Levy, Peder K. Batalden; Strapp & Strapp and W. Joseph Strapp for Defendant and Appellant.

OPINION

**GRIMES, J.—**

## SUMMARY

In this wrongful termination case, judgment was entered on a jury verdict awarding plaintiff $1,237,086 in compensatory damages and an equal amount in punitive damages. Defendant filed a motion for a new trial and a motion for judgment notwithstanding the verdict (JNOV), the latter with respect to punitive damages only. The trial court granted the new trial motion.

■ Plaintiff appealed from the order granting a new trial and defendant cross-appealed. We affirm the judgment. Defendant's new trial motion was denied by operation of law because the trial court failed to make its ruling within 60 days after defendant filed the motion. As to defendant's cross-appeal, we conclude (1) the record contained sufficient evidence of defendant's financial condition to support the punitive damages award, and (2) there was substantial evidence supporting the jury's finding that plaintiff's complaint of sexual harassment of a colleague was a motivating reason for her discharge.

## FACTS

Plaintiff Teresa D. Green sued defendant Laibco, LLC (doing business as Las Flores Convalescent Hospital), when she was fired after more than 21 years of employment. Plaintiff was activities director for Las Flores and was discharged after one of the residents was badly burned when he accidentally set himself on fire while smoking. Plaintiff was not present at the time, but her three-person department was generally responsible for supervising unsafe smokers while they smoked during the day shift.

Plaintiff alleged causes of action for wrongful termination in violation of public policy and for retaliation under the California Fair Employment and

Housing Act (FEHA; Gov. Code, § 12900 et seq.). She alleged she was terminated because of her complaints about patient care and safety, because she refused to give false information to the State Department of Health Care Services, and because she complained about the sexual harassment of one of her colleagues.

We will not dwell at length on the facts of this case. Because the trial court lost jurisdiction to grant a new trial, the relevant facts relate only to the issues defendant has raised: whether the record contained sufficient evidence of defendant's financial condition to support the award of punitive damages, and whether sufficient evidence supported the jury's finding that plaintiff's complaint about the sexual harassment of her colleague was a motivating factor in her discharge. We will recite the facts relevant to those issues in connection with our legal discussion.

For the rest, this synopsis of the evidence should suffice. Plaintiff, a diligent and well-liked employee who loved her job as activities director, began working for Las Flores in 1986. For the first 20 years, Las Flores was operated by Diana Fortune and had an excellent reputation; it was not filled to capacity and its patients were elderly and often frail. Fortune described plaintiff's performance of her work as "[a]bsolutely exceptional."

In January 2006, defendant took over the operation of Las Flores. Defendant's chief executive officer (CEO), Laib Greenspoon, replaced Fortune as administrator. Las Flores was soon filled to capacity, and many of its residents were admitted with psychiatric diagnoses; some exhibited violent behaviors. One resident assaulted plaintiff when she tried to calm him; many new patients were homeless; many were unkempt and dirty; and some had infectious diseases. Other patients reported thefts. Staffing problems increased, with patients "more neglected, laying in the bed more," and a "lackadaisical" attitude.

Plaintiff complained to Greenspoon and others in management about patient care and safety deficiencies in light of the problems that accompanied the influx of new patients into the population of frail and elderly patients. She also complained about "dignity issues," where residents would ask for assistance to the restroom and be told to "just use your diaper," and about staffing issues, telling Greenspoon that more staffing was needed and that the staff were not adequately trained for the patients coming in with psychiatric diagnoses. Her complaints were ignored, or she was told management would "look into it."

On Friday, March 30, 2007, Las Flores resident Joseph Schlank set himself on fire while smoking on the residents' smoking patio and was badly burned.

At the time, plaintiff had left the facility to run some work-related errands. The dietary supervisor, Desiree Buchanan, was on the smoking patio at the time, but was standing with her back turned to Schlank and was speaking on a cell phone about a family emergency.

The activities department staff provided most of the supervision for smokers during the day shift (although sometimes a nursing assistant would monitor the smokers), but all Las Flores employees shared general responsibility for patient safety. There was conflicting testimony on whether Schlank had been designated a safe or an unsafe smoker (only the latter needed monitoring). Initially Schlank had been designated a safe smoker, but he had been hospitalized for a stroke and recently returned to Las Flores; he was supposed to have been reevaluated after his return. Plaintiff testified the new evaluation showing Schlank to be an unsafe smoker was created on the day of the accident and backdated to January, and that plaintiff was pressured into signing it. There was also conflicting testimony on whether plaintiff notified others that she was leaving the premises; plaintiff and two others testified she never left work during the day without notifying other staff.

On Monday, April 2, 2007 (following Schlank's burning on Friday), Greenspoon called plaintiff at her home. (Plaintiff was off duty that day.) Greenspoon estimated the call lasted one to two minutes. Plaintiff said Greenspoon told her that "it would look better for the hospital, to the Department of Health, if I [(plaintiff)] were to say that I was present on the patio at the time of the accident," and she replied, " 'I was not present. I didn't see it. I wasn't there.' " Plaintiff said Greenspoon repeated his statement several times, and also said, " 'You could say that you were out there working on some charting or something like that.' " Jerome Edgar, with whom plaintiff lived and who was present during the phone call, testified that plaintiff said several times "[s]omething to the effect of, 'No, Laib. I wasn't there. I didn't see it.' "

On April 17, 2007, Greenspoon discharged plaintiff. He testified he conducted a "thorough" investigation of the Schlank incident, which he did not document, and that his investigation "concluded that it was [plaintiff's] negligence." Except for his one- or two-minute phone call, he did not seek information from plaintiff (and did not talk with her assistant, Roxana Marroquin).

The jury, after 39 minutes of deliberation, found in special verdicts that plaintiff's refusal to give false information to the State Department of Health Care Services, her complaint of sexual harassment of Roxana Marroquin, and her complaints about patient care and safety were motivating reasons for defendant's decision to discharge her. The jury awarded plaintiff $1,237,086

in compensatory damages ($59,166 for past economic loss, $177,920 for future economic loss, $750,000 for past noneconomic loss, including emotional distress, and $250,000 for future noneconomic loss), and found by clear and convincing evidence that defendant's conduct was committed with malice, oppression or fraud. After further testimony, the jury awarded plaintiff $1,237,086 in punitive damages.

Las Flores filed a motion for a new trial and a motion for JNOV, the latter with respect only to punitive damages. The trial court granted the new trial motion, noting that its ruling "automatically grants a new trial also on the issue of punitive damages." The court indicated that, if it were to consider defendant's JNOV motion in the absence of a new trial motion, it would grant the JNOV motion to excise the punitive damages amount from the verdict.

Plaintiff appealed from the order granting a new trial, and defendant cross-appealed from the judgment and the order denying its JNOV motion.

## DISCUSSION

1. *Plaintiff's Appeal from the Order Granting a New Trial*

Plaintiff contends the court's new trial order is void for lack of jurisdiction because the trial court granted the motion after expiration of the 60-day period within which it had the authority to grant a new trial. Plaintiff is correct.

    a. *The chronology*

On August 18, 2008, the jury rendered its verdicts.

On September 19, 2008, defendant filed a notice of intention to move for a new trial, as well as a motion for judgment notwithstanding the verdict on punitive damages.

On October 20, 2008, plaintiff filed and served notice of entry of the judgment that had been entered on October 14, 2008.

On October 27, 2008, the trial court held a hearing on defendant's new trial and JNOV motions and took the motions under submission. At the hearing, the trial judge stated: "I thought I had 60 days from the entry of judgment which apparently was on October 14. [¶] You're telling me I had 60 days from the entry—or from the filing of the motion for new trial, which you say will expire on November 16; is that correct?" Defense counsel

responded, "November 18, I believe, Your Honor." The trial court stated, "November 18. Well, I certainly hope that I can rule upon this before November 18."

On November 19, 2008, the trial court entered its order granting defendant's motion for a new trial.

b. *The law*

■ Code of Civil Procedure section 660 (section 660) states in pertinent part that: "[T]he power of the court to rule on a motion for a new trial shall expire 60 days from and after the mailing of notice of entry of judgment by the clerk of the court . . . or 60 days from and after service on the moving party by any party of written notice of the entry of the judgment, whichever is earlier, *or if such notice has not theretofore been given, then 60 days after filing of the first notice of intention to move for a new trial.* If such motion is not determined within said period of 60 days, or within said period as thus extended, the effect shall be a denial of the motion without further order of the court." (Italics added.) Section 660's time limits are mandatory and jurisdictional, "and an order made after the 60-day period purporting to rule on a motion for new trial is in excess of the court's jurisdiction and void." (*Siegal v. Superior Court* (1968) 68 Cal.2d 97, 101 [65 Cal.Rptr. 311, 436 P.2d 311].)

The words of section 660 are clear and unambiguous: where no notice of entry of judgment has been mailed or served before the filing of notice of intention to move for a new trial—"if such notice [of entry of judgment] has not *theretofore* been given"—the 60-day period begins to run from the date of filing of the notice of intention to move for a new trial. (Italics added.)

Here, the trial court did not enter its order in the minutes or sign an order until November 19, 2008, 61 days after defendant filed its notice of intention to move for a new trial. By that date, the court's power to rule on the motion had expired, and its order was void. Several appellate courts over the years have reached the same conclusion on this issue in similar circumstances, and none has concluded otherwise. (*Bunton v. Arizona Pacific Tanklines* (1983) 141 Cal.App.3d 210, 213, 216 [190 Cal.Rptr. 295] (*Bunton*) [new trial order entered 63 days after filing of notice of intention to move for a new trial and 56 days from mailing of notice of entry of judgment by the clerk; clerk's later mailing does not commence a new 60-day period]; see *In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 151 [242 Cal.Rptr. 649] (*Liu*) [§ 660 "unambiguously provides that the filing of the first notice of intention to move for a new trial is the operative event for determining the 60-day period where notice of entry of judgment 'has not *theretofore* been given' " (italics added by *Liu*

court)]; *Rubens v Whittemore* (1934) 2 Cal.App.2d 575, 577 [38 P.2d 153] (*Rubens*) [where no notice of entry of judgment had been served before the filing of the notice of intention to move for a new trial, "the time commenced to run within which the court might grant the motion on [the date the notice of intention was filed], and expired sixty days thereafter," so the new trial order was made without jurisdiction]; see also Wegner et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2010) ¶ 18:357, p. 18-75 (rev. # 1, 2010) [60-day jurisdictional clock starts running "on the *first* of these triggering events"; "where notice of intention to move for new trial is filed *before* a notice of entry of judgment, the later notice does *not* trigger a new 60-day period" (citing cases)].)

Despite the clarity of the statutory language and the unanimity of the appellate authorities that have construed it, defendant argues for a contrary conclusion. Defendant argues that *Liu*, *Bunton* and *Rubens* are inconsistent with the Supreme Court's opinions in *Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265 [135 Cal.Rptr.2d 654, 70 P.3d 1067] (*Palmer*) and *Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892 [215 Cal.Rptr. 679, 701 P.2d 826] (*Sanchez-Corea*). Defendant points to language in *Sanchez-Corea* where the court, describing section 660, stated that the 60-day period "runs from the mailing of notice of entry of judgment by the clerk or the service of notice of entry of judgment, whichever is earlier, or if no such notice is given, from initial notice of intent to move for new trial." (*Sanchez-Corea*, at p. 899.) Similarly, the court in *Palmer*, while quoting section 660, paraphrased the statutory words "or if such notice has not theretofore been given" by saying, "or if such notice is not given," before continuing to quote the remainder of the statutory language. (*Palmer*, at p. 1275.)

■ Defendant's argument is without merit. Neither *Sanchez-Corea* nor *Palmer* had anything to do with the issue presented in this case. *Sanchez-Corea* involved whether a trial court's noncompliance with a mandatory statutory requirement to state the grounds for a new trial order could be cured nunc pro tunc (*Sanchez-Corea, supra*, 38 Cal.3d at p. 896), and *Palmer* involved whether the statutory requirement of giving written notice of entry of judgment was satisfied by serving a copy of the file-stamped judgment. (*Palmer, supra*, 30 Cal.4th at p. 1267.) Indeed, when *Palmer* reproduced the statutory language in a footnote, it used an ellipsis instead of the language at issue here. (*Id.* at p. 1271, fn. 3.) An opinion is not authority for a proposition not considered in it (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689]), and the statutory language at issue here was irrelevant in *Palmer* and *Sanchez-Corea*, neither of which even quoted the language. (See also *Liu, supra*, 197 Cal.App.3d at p. 151 [*Sanchez-Corea* did

not consider the issue before the court in *Liu*; "*Bunton* properly articulates the law on this issue and has not been undermined or modified by *Sanchez-Corea*."].)

Since we find the statutory language is unambiguous, we deny defendant's motion to take judicial notice of the legislative history of the 1929 amendments to the statute.

### 2. *The Sufficiency of the Evidence of Defendant's Financial Condition*

In its cross-appeal, defendant's only claim with respect to the punitive damages award is that plaintiff "failed to introduce any evidence of Las Flores' net worth or financial condition," and the trial court therefore should have granted defendant's JNOV motion on that issue. This contention is also without merit.

#### a. *The facts*

Plaintiff sought information on defendant's financial condition during discovery. The court denied plaintiff's motion to compel further responses to interrogatories and ordered counsel for defendant to "provide to the Court a current financial statement on the day of trial." The trial began on August 12, 2008. Defendant did not produce its current financial statement that day. On August 18, after the jury's verdict awarding compensatory damages and finding Las Flores had acted with malice, oppression or fraud, the court asked defense counsel for his "paper describing the financial condition of the defendant," and defense counsel stated he had "a financial statement with the balance sheet and [profit] and loss statement, most current one being, I think, of June '08." The court instructed him to provide it to plaintiff's counsel, and told plaintiff's counsel to look at the financial statement.

After a pause in the proceedings, plaintiff's counsel said that the document "doesn't even have totals that are comprehensible, [and] puts us at a significant disadvantage to begin now." The court asked plaintiff's counsel what the document showed as the company's net worth, and counsel said she did not know. She said that she had read financial statements, "but this one is not condensed, compiled, nor summarized"; it was "24 pages, Your Honor, and I don't exactly see a bottom line total." The court told defense counsel, "I do need to know whether it's a positive net worth or not," and defense counsel responded, "It is, Your Honor." The court asked if defense counsel wanted "to shed any more information than that," but there was then another pause in the proceedings and defense counsel did not respond.

The jury returned, and plaintiff's counsel called Greenspoon (defendant's CEO) to the stand "with the financial statement that he lodged with Your

Honor." After Greenspoon confirmed the document was defendant's current financial statement, this exchange ensued:

"Q Sir, what are the net assets of . . . Laibco?

"A I produced whatever is here. And like you said, I don't—I don't know the balance sheet myself that well. I know the P and L, which is here.

"Q Well, I don't know your accounting statements either. That's why I'm asking you. And I welcome you to use this 24 pages of stuff. [¶] What are the current net assets of Laibco . . . ?

"A I don't know how to answer the question. [¶] . . . [¶]

"Q So what is your best estimate as to the current assets of Laibco . . . ?

"A Would you like to know the bank balance?

"Q I want the total balance. I want all of the assets, not just one bank balance, sir.

"A I don't think I can give an answer. [¶] . . . [¶]

"Q Sir, you're the C.E.O., and you don't have a clue what the total assets of Laibco are?

"A No.

"Q Do you have an estimate what the total liabilities are?

"A No.

"Q You don't know if you're in the black?

"A That wasn't the question.

"Q Well, I'm asking now, do you know if you're in the black?

"A Yes, I do.

"Q You're in the black, not the red?

"A Correct."

After Greenspoon repeatedly stated that he did not know Laibco's net worth, the dialogue continued:

"Q Please identify for our jury, that will be looking at this document, where the current net worth is.

"A Again, I can't give you net worth. I can give you net income . . . . [¶] . . . [¶]

"Q . . . What was the net income for Laibco . . . for the last 12 months, sir?

"A I believe it's this number on page 23, $677,343."

Plaintiff's counsel eventually stated she had no further evidence. After arguments to the jury, plaintiff's counsel stated (referring to the financial statement), "This exhibit will go in with the jury, please?" The court replied, "No." Out of the presence of the jury, plaintiff's counsel then asked, "Why isn't that financial statement that Mr. Greenspoon relied upon part of the record and something the jury can see?" The court replied: "You didn't offer it into evidence during your case. You got into evidence the important issue, which is that $677,000 was the net profit of the company for the 12 months ended June 2008. If you can't understand the financial statement and Mr. Greenspoon can't understand the financial statement, I'm not going to ask the jury to understand the financial statement. [¶] If you had asked to put it into evidence during your case, then I might have had a more difficult question, but you didn't."

The jury returned with a punitive damages verdict against defendant of $1,237,086.

Defendant moved for JNOV, arguing only (as it does in its cross-appeal) that the punitive damages award was fatally defective because the trial record was "completely devoid of any meaningful evidence of the Defendant's financial condition." In its minute order ruling on defendant's posttrial motions, the trial court indicated that, had there been no new trial motion, then it "would [grant] the JNOV motion to excise the punitive damage amount from the jury's verdict," stating that "[t]his was addressed in the court's Tentative Ruling issued on October 27." In that tentative ruling, the court concluded that "a new trial must be offered to plaintiff on her claim of liability for punitive damages and the calculation of any punitive damages." The court observed that plaintiff's evidence as to defendant's net worth and ability to bear a punitive damage award was inadequate, and that "[b]oth parties bear some fault for this situation."

### b. *The law*

■ Evidence of the defendant's financial condition is a prerequisite for an award of punitive damages. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 108–109 [284 Cal.Rptr. 318, 813 P.2d 1348] (*Adams*) ["an award of punitive damages cannot be sustained on appeal unless the trial record contains meaningful evidence of the defendant's financial condition"].) "Without such evidence, a reviewing court can only speculate as to whether the award is appropriate or excessive." (*Id.* at p. 112.) Plaintiff has the burden of proof. (*Id.* at p. 119.)

■ *Adams* "decline[d] . . . to prescribe any rigid standard for measuring a defendant's ability to pay." (*Adams, supra*, 54 Cal.3d at p. 116, fn. 7 ["[w]e cannot conclude on the record before us that any particular measure of ability to pay is superior to all others or that a single standard is appropriate in all cases"].) In *Baxter v. Peterson* (2007) 150 Cal.App.4th 673 [58 Cal.Rptr.3d 686], the court summarized the pertinent court of appeal authorities on the point: "Net worth is the most common measure, but not the exclusive measure. (*Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 621, 624–625 [103 Cal.Rptr.2d 492] [evidence that defendant was 'a wealthy man, with prospects to gain more wealth in the future']; see *Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 582–583 [107 Cal.Rptr.2d 308] ['Net worth is too easily subject to manipulation to be the sole standard for measuring a defendant's ability to pay'].) In most cases, evidence of earnings or profit alone are not sufficient 'without examining the liabilities side of the balance sheet.' [Citations.] 'What is required is evidence of the defendant's ability to pay the damage award.' [Citation.] Thus, there should be some evidence of the defendant's actual wealth. Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income." (*Baxter v. Peterson, supra*, 150 Cal.App.4th at p. 680.)

The question for us is whether, under the circumstances of this case, evidence of defendant's profit of $677,343 for the then most recent 12-month period, and evidence of defendant's positive net worth, constitutes the necessary "meaningful evidence of the defendant's financial condition." (*Adams, supra*, 54 Cal.3d at p. 109.) (Greenspoon also testified during the trial on liability that Las Flores had been a good investment for him.) Defendant says the profit and positive net worth evidence is not meaningful evidence of its financial condition, contending that plaintiff's failure to introduce evidence of the amount or measure of defendant's net worth "left the jury unable to determine Las Flores' financial condition," and the jury "had no way of knowing whether Las Flores had substantial assets, or whether it was instead saddled with large debts." Defendant cites *Robert L.*

*Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141 [82 Cal.Rptr.2d 143] (*Robert L. Cloud*), where the court observed that "evidence of the defendant's annual income, standing alone, is not 'meaningful evidence.'" (*Id.* at p. 1152.)

We conclude the evidence presented was sufficient for an assessment of defendant's financial condition. Further, even if the record *were* "completely devoid of any meaningful evidence" of defendant's financial condition—which it is not—any deficiency may be laid at the door of defendant, whose chief executive officer purported to be both ignorant of his company's financial condition and unable to read its financial statements. Either way, the jury's award of punitive damages is *not* "fatally defective" for lack of sufficient evidence.

First, the evidence that plaintiff managed to eke out of CEO Greenspoon was meaningful evidence of defendant's financial condition. *Robert L. Cloud*'s rejection of "annual income, standing alone" as "not 'meaningful evidence'" (*Robert L. Cloud, supra*, 69 Cal.App.4th at p. 1152) is not pertinent here; the evidence showed defendant's profit for the most recent year, not its income. And Greenspoon's testimony that defendant was "in the black" (and that Las Flores was a "good investment") tells the jury that defendant's assets were greater than its liabilities, so the specter that defendant may have been "saddled with large debts" does not appear to be a reasonable inference to draw.

In the end, "[w]hat is required is evidence of the defendant's ability to pay the damage award." (*Robert L. Cloud, supra*, 69 Cal.App.4th at p. 1152.) Here, the punitive damages award was $1.237 million or, roughly speaking, not quite twice the most recent annual profit of a company whose assets exceed its liabilities. It is reasonable to infer from the evidence that defendant had the ability to pay the award: that is, while the award will indeed punish the company, it will not bankrupt it. (See *id.* at pp. 1151–1152 ["absence of evidence of the defendant's financial condition frustrates meaningful appellate review, since the appellate court cannot determine whether the award might bankrupt the defendant"].) No more is necessary.

Second, we cannot leave this subject without comment on what may be described colloquially as defendant's chutzpah in insisting that plaintiff failed to meet her burden to prove defendant's financial condition. The notion that the jury did not have necessary information about defendant's net worth because plaintiff did not move defendant's financial statements into evidence—statements which defendant's own CEO could not read—is the height of absurdity. The jury did not have information about defendant's net worth because defendant's CEO engaged in stonewalling, pure and simple, from beginning to end.

The court ordered defendant to submit its financial statements on the day of trial. Defendant did not lodge the statements on the first day of trial. Instead, it produced what it described as its balance sheet and profit and loss statement at the last possible moment—after the jury rendered its verdict on liability and while the jury was waiting to begin the punitive damages phase of the trial. The statements produced were apparently unintelligible, as neither plaintiff's counsel nor defendant's CEO could find the net worth of the company. Then, Greenspoon—the CEO and administrator of defendant— testified, "I don't know the balance sheet myself that well," and "I don't know how to answer the question" (about defendant's current net assets), and "I don't think I can give an answer" (as to his best estimate of defendant's current assets). Neither could he estimate defendant's liabilities, and when asked to point out where the financial statements showed net worth, he said, "Again, I can't give you net worth."

Thus, Greenspoon failed to respond to direct questions, the answers to which he likely knew—or at the least, by the time he testified, should have known. He was well aware that net worth and related issues would be raised and that he was required to provide that information, yet he delayed providing any information at all to the court. And when he did provide it, he gave information that he said he could not interpret. That is, he purported not to know the answers to the most basic financial questions about the company that he knew he would be called upon to answer. In short, Greenspoon rather plainly stonewalled plaintiff's counsel—and the court and the jury. This is obvious from a cold transcript, and it was no doubt obvious to the jury.

Under these circumstances, and since the jury knew defendant was "in the black" and had profits of more than $677,000 in the most recent year, the jury was entitled to infer that punitive damages of $1.237 million did not exceed the defendant's ability to pay. (See *Zaxis Wireless Communications, Inc. v. Motor Sound Corp., supra,* 89 Cal.App.4th at p. 582 ["[t]he issue before us does not turn on defendant's net worth"; the question was "whether the amount of damages exceeds the defendant's ability to pay"]; cf. *Caira v. Offner* (2005) 126 Cal.App.4th 12, 37 [24 Cal.Rptr.3d 233] [court's order directing defendant to produce a current financial statement "precludes [defendant] from claiming on appeal that the record contains insufficient evidence of his financial condition"].)

3. *The Sufficiency of the Evidence on Plaintiff's FEHA Claim*

The jury's special verdict for plaintiff included findings that plaintiff complained of sexual harassment of her colleague, Roxana Marroquin, to defendant's administrator (Greenspoon), and that plaintiff's complaint was a motivating reason for defendant's decision to discharge her. In its cross-appeal, defendant contends plaintiff may not seek attorney fees under the

FEHA because there was insufficient evidence for the jury's finding that her sexual harassment complaint was a motivating factor in her discharge. We disagree.

The circumstances were these. Roxana Marroquin was plaintiff's assistant. Marroquin told plaintiff that maintenance worker Javier Castellanos was harassing her, "asking her out and following her around." Castellanos's conduct made Marroquin very uncomfortable and upset, and Marroquin told plaintiff she would quit "if something wasn't done." Plaintiff saw Castellanos stare at Marroquin inappropriately, and other staffers told plaintiff they saw Castellanos "making gestures and various things."

Defendant's policy required plaintiff to report sexual harassment and she did so. She and Marroquin met with Greenspoon in the spring of 2006. Greenspoon "didn't appear particularly interested" and "said he'd look into it." After this meeting, "all hell kind of broke loose." Castellanos had a close relationship with Desiree Buchanan, defendant's dietary supervisor (they later married), and Buchanan was friendly with the director of nursing services, Alma Renita Morgan. After plaintiff reported the harassment of Marroquin, her activities department did not get the staff support it needed to provide its services; plaintiff had "difficulty getting assistance in many areas—dietary, nursing." It was hard to get refreshments from the kitchen, and residents known to be disruptive would be placed in activities department programs. When plaintiff told management (Morgan) that she felt she was being retaliated against for reporting the harassment, Morgan replied, " 'Well, why did you—why did you report that? You hurt [Buchanan]. You made her cry. Doesn't [Marroquin] know how to handle herself?' "

Plaintiff testified that these conditions persisted until she was terminated, and that her pay was affected as well; when she requested pay increases for Marroquin and later for herself (after being at the same wage for a couple of years), Greenspoon's response was that he "would look into it." After plaintiff was terminated, Marroquin received a raise.

Defendant contends there was "no evidence that Las Flores was motivated to terminate [plaintiff's] employment because she supported Marroquin's charge," and that "[t]his means that [plaintiff's] proof of causation must have rested entirely on an inference arising from the temporal proximity between her support for Marroquin and her eventual termination." Ergo (according to defendant), plaintiff's claim fails because temporal proximity alone is insufficient to prove causation, and in any event, too much time elapsed between plaintiff's complaint in the spring of 2006 and her termination in April 2007 to permit a reasonable inference that her complaint was a motivating factor for her termination.

Defendant's argument founders from beginning to end. Its premise that there was no evidence plaintiff's complaint was a motivating factor in her termination is simply wrong. The evidence—which we view in the light most favorable to plaintiff—showed that various sorts of retaliatory conduct began immediately after her complaint and persisted until her employment ended. From this a jury could reasonably infer that plaintiff's complaint about Marroquin's sexual harassment was a motivating factor in her later termination. (See *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 421 [69 Cal.Rptr.3d 1] ["[a] long period between an employer's adverse employment action and the employee's earlier protected activity may lead to the inference that the two events are not causally connected," but "if between these events the employer engages in a pattern of conduct consistent with a retaliatory intent, there may be a causal connection"].) The jury concluded there was a causal connection, and it is not within our province to conclude otherwise. Accordingly, defendant's contention that plaintiff may not recover attorney fees is without merit.

## DISPOSITION

The order granting a new trial is vacated, the judgment entered on the jury verdict for plaintiff is affirmed, and the trial court is directed to hold a hearing on plaintiff's motion for attorney fees and costs. Plaintiff is to recover her costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 13, 2011, S191331.