Filed 6/12/14  Riggs v. Baldoni CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NANCY RIGGS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>EUGENE BALDONI,<br><br>    Defendant and Appellant. | B246833<br><br>(Los Angeles County<br>Super. Ct. No. VC059412) |

APPEAL from an order and a cross-appeal from a judgment of the Superior Court of Los Angeles County, Thomas I. McKnew, Jr., Judge.  Order reversed and the judgment is affirmed.

Balisok & Associates, Inc. and Russell S. Balisok for Plaintiff and Appellant.

Law Office of John A. Bunnett and John A. Bunnett; The Miles Law Firm and Lawrence W. Miles, Jr. for Defendant and Appellant.

Thelma Riggs died in 2011 at the age of 83, several months after she had been moved out of her home by the defendant Eugene Baldoni. Thelma's daughter, Nancy Riggs, sued Baldoni for elder abuse in her capacity as administrator of her mother's estate, and alleged that Baldoni "misled, confused, and prevailed upon Thelma to sign a deed of her home to Baldoni . . . ."[1] At the conclusion of trial, the jury returned a verdict awarding the estate $320,000 in compensatory damages for Thelma's house, $100,000 for emotional distress suffered by Thelma, and $100,000 in punitive damages. Baldoni moved for a new trial, and the trial court granted the motion on the ground that there had been jury misconduct. Nancy appeals and contends that the trial court erred in granting a new trial after the statutory time period had expired. On cross-appeal, Baldoni contends that the verdict was not supported by substantial evidence and was void due to juror misconduct. We reverse the trial court's order granting a new trial and affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

1.      *Thelma's Life on Pangborn Avenue and Subsequent Transfer to Assisted Care*

Thelma lived in a house on Pangborn Avenue for over fifty years. She raised her children there, and after they moved out in the 1970's, she lived alone except for the occasional boarder. Baldoni is the same age as Thelma's son and lived in a house two blocks away. Baldoni first met Thelma when he came over to her house as a child to see her son.

---

[1]      For simplicity and clarity, we refer to Nancy and Thelma Riggs by their first names. We intend no disrespect or undue familiarity.

How Baldoni's relationship with Thelma progressed over the decades that followed is subject to dispute. On December 1, 2007, when Thelma was 79 years old, she purportedly signed a grant deed giving Baldoni title to her house. Approximately two and one half years later, on July 21, 2010, Baldoni recorded the deed. On December 28, 2010, Thelma purportedly executed a Durable Power of Attorney for Health Care designating Baldoni as her attorney in fact to make health care decisions for her. One week later, Baldoni moved Thelma into an assisted care facility, the Woodruff Care Home.

Thelma was evaluated by a physician upon her entry to the Woodruff Care Home. The physician diagnosed Thelma with dementia, and noted that she was confused, disoriented and had difficulty "verbalizing" and communicating her needs. The administrator at the Woodruff Care Home also observed that Thelma had dementia, had "trouble with word formation," and would become "agitated" when she was "unable to verbalize."

The following month, Thelma was transferred to the hospital after she stopped eating and complained of a pain in her back. At the hospital, the doctor noted that Thelma "need[ed]" a feeding tube "for long-term nutritional support." Baldoni did not authorize the insertion of a feeding tube. On March 3, 2011, Thelma was released back to the Woodruff Care Home without a feeding tube.

On March 12, 2011, Nancy discovered that Thelma was no longer living at home. When Nancy stopped by her mother's house to see her, some of Thelma's

3

neighbors told Nancy that Baldoni had "stole[n] [her] mother's house" and moved Thelma to the Woodruff Care Home. Nancy immediately went to see Thelma.

When Nancy arrived at the Woodruff Care Home, she encountered Baldoni and told him " 'you may have been able to take advantage of my mother and my brother who are disabled, but I'm not disabled. You are now dealing with me.' " She demanded that Baldoni "return" Thelma's home. Nancy then went to see her mother and found that Thelma did not recognize her and was "frail, sick, weak, [and] shivering." After Nancy left the Woodruff Care Home, she drove to the police department and made a complaint about Baldoni.

Nancy returned to visit Thelma, however, on March 18, 2011, Thelma was found unconscious and was transferred to the hospital. She was subsequently discharged with a feeding tube to hospice care. On April 6, 2011, Nancy obtained temporary letters of conservatorship for Thelma. Thelma died on April 29, 2011.

2.    *The Elder Abuse Action*

On August 29, 2011, Nancy filed a complaint against Baldoni for financial elder abuse alleging that Baldoni had "misled, confused, and prevailed upon Thelma to sign a deed of her home to [him], without understanding the nature and consequences of her act by inducing reliance and trust."[2] The case proceeded to a jury trial. At trial, Nancy testified that her mother had always had a "mental illness." She further said that her

---

[2]    Nancy also brought a cause of action for quiet title that was later dismissed. In addition, although Nancy initially filed suit in her individual capacity, she later substituted as plaintiff the Estate of Thelma Riggs and obtained permission from the court to prosecute the action on the estate's behalf in her capacity as administrator of the estate.

4

mother had experienced delusions throughout her life, and had often told Nancy she had seen a man standing at the foot of her bed in the middle of the night and people walking along the fence on her property. According to Nancy, Thelma had always been in the care of a psychiatrist.

Baldoni testified that he met Thelma when he became friends with her son. After Thelma's son moved out of the house, Baldoni said he "would drive by and say hi to [Thelma] maybe a few times a month." Starting in 2005, he visited her more frequently, and sometime during that year, he claimed that Thelma said he "should have [her] house." Baldoni testified that he was "very close to" Thelma, and asserted that she wanted to give him her house because "she didn't want to give it to her children."

Baldoni stated that, in 2007, he started helping Thelma clean her house and also hired a woman to care for Thelma for 30 hours a week. With respect to Thelma's mental status, Baldoni testified that, during the six years prior to Thelma's hospitalization, he had never observed a decline in Thelma's "cognitive function" but that she, in fact, "seemed" to become "sharper" during that period. He also said he had never observed her to be "delusional."

Several of Thelma's neighbors also testified at trial. One neighbor testified that he had lived next door to Thelma between December 2005 and November 2008 and "would see her and talk to her just about daily," but had never seen Baldoni. Another neighbor denied seeing a "female companion visit[ing] [Thelma] regularly." A third neighbor said she had never seen Baldoni at Thelma's house until the day Baldoni moved Thelma's furniture to the curb "with a sign that said for 'free.' " A fourth

5

neighbor said that she had seen Thelma "mostly every day" but had never seen Baldoni until "he moved all of Thelma's things out of her house." The two neighbors who had actually seen Baldoni on Thelma's property testified that when they asked him where Thelma was, he said that he took her to a brother's place temporarily while he fixed up the house. Baldoni denied ever telling Thelma's neighbors that she was at her brother's, but stated that he promptly told them that Thelma was at the Woodruff Care Home.

Several neighbors also claimed that Thelma experienced delusions. Thelma told neighbors that she "hear[d] aliens in her home," that there were "people up in her attic" and "walking around her house," and that she saw "people that weren't really there." Thelma was also "always worried someone was out to get her," so one neighbor suggested to her "for a while" that she transfer title of her property to a trust. However, Thelma "refused to consider it" because "she was paranoid, absolutely paranoid, that just signing anything would -- she would -- her house was her castle. She was afraid of losing her house." Multiple neighbors said that Thelma "wasn't all there."

Dr. John Adams, the doctor who evaluated Thelma when she was admitted to the Woodruff Care Home, testified as to her diagnosis of dementia and opined that her mental condition had "probably" been the same for two years prior to his examination. At the time of the examination, Dr. Adams noted that Thelma exhibited "aggressive behavior" when she had resisted the facility's employees' attempts to help her bathe and dress. The administrator of the Woodruff Care Home testified that from the moment Thelma arrived, she was unable to sleep and was prescribed a medication designed to "calm someone down."

6

After closing arguments, the jury deliberated for a day and then returned with a verdict finding Baldoni guilty of financial elder abuse. The jury voted 11 to 1 to award the Estate of Thelma Riggs $320,000 for the value of the house and $100,000 for Thelma's pain, suffering or emotional distress. Upon further deliberation, the jury voted 11 to 1 to award $100,000 in punitive damages.

3.     *Baldoni's Motions for New Trial and Judgment Notwithstanding the Verdict*

Judgment was entered on October 11, 2012. On October 25, 2012, Baldoni served a notice of intent to move for a new trial and filed a motion for judgment notwithstanding the verdict. On November 6, 2012, Baldoni filed his moving papers in support of the motion for a new trial and a supporting affidavit in which a juror stated that "[t]he jury could not agree on damages so they took an average of the eleven jurors who favored liability."

On December 3, 2012, a hearing was held on the motions. The court denied the motion for judgment notwithstanding the verdict. The court also denied the motion for a new trial except with respect to the argument that the jury had engaged in misconduct by "agree[ing] to a compromise verdict." On December 12, 2012, the court issued its written ruling on the motion for a new trial and noted that there was a "60-day time limit from date of entry of judgment or when the notice of intention to move for a new trial is filed, whichever is earlier, for the court to rule. As the defendant has the burden to satisfy the court of his assertion that general and punitive damages were based upon averaging the amounts recommended by each juror, I will require not less than three (3)

7

additional, properly prepared affidavits from jurors to clearly establish the alleged wrongful conduct in reaching the verdict . . . . "

Baldoni filed three additional juror affidavits on December 21, 2012, and three more on December 24, 2012. However, the court did not issue a further ruling on the motion for a new trial. On January 14, 2013, Baldoni moved ex parte for "confirmation of the Court's ruling regarding defendant's motion for new trial" and, after considering the application, the court granted a new trial. Nancy timely appealed, and Baldoni timely cross-appealed.

### CONTENTIONS

On appeal, Nancy contends that the trial court erred in granting a new trial after the statutory time period had expired. On cross-appeal, Baldoni contends the judgment is void due to juror misconduct. Baldoni also contends that the trial court erred in denying judgment notwithstanding the verdict because the verdict was not supported by substantial evidence.

### DISCUSSION

1.  *The Trial Court's Order Granting a New Trial Was Untimely*

Nancy argues that the trial court's order granting a new trial was filed outside of the 60-day jurisdictional period in which a court may rule on a new trial motion. Code of Civil Procedure section 660 provides, in relevant part: "the power of the court to rule on a motion for a new trial shall expire . . . 60 days from and after service on the moving party by any party of written notice of the entry of the judgment . . . *or if such notice has not theretofore been given,* then 60 days after filing of the first notice of

8

intention to move for a new trial." (Italics added.) "The words of [Code of Civil Procedure] section 660 are clear and unambiguous: where no notice of entry of judgment has been mailed or served before the filing of notice of intention to move for a new trial—'if such notice [of entry of judgment] has not *thereofore* been given'—the 60-day period begins to run from the date of filing of the notice of intention to move for a new trial. (Italics added.)" (*Green v. Laibco, LLC* (2011) 192 Cal.App.4th 441, 447.)

Here, notice of entry of judgment was not given prior to Baldoni's filing of a notice of intent to move for new trial on October 25, 2012. Therefore, the 60-day period established by Code of Civil Procedure section 660 began to run on October 25, 2012, and expired 60 days later on December 24, 2012. The trial court did not rule on the issue of juror misconduct raised by Baldoni within that 60-day period. Therefore, the court's attempt, after expiration of the 60-day period, to grant the new trial motion was "ineffective as an act in excess of jurisdiction."[3] (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 905.)

2. *There Was No Jury Misconduct*

Baldoni contends that "[t]he jury acted improperly . . . in averaging their verdict between the jurors." Baldoni is, in essence, challenging the trial court's denial of his

---

[3] The trial court also erred in considering the juror affidavits filed a few days before the 60-day period elapsed. "[Code of Civil Procedure] [s]ection 659a provides that the [] party [moving for a new trial] *shall* file his affidavits within 10 days . . . . The trial court 'may, for good cause shown by affidavit or by written stipulation of the parties, [extend the time to file] for an additional period of *not exceeding 20 days.*' (Italics added.) Since the 20-day period may not be exceeded the trial court has no discretion to admit affidavits submitted thereafter." (*Erikson v. Weiner* (1996) 48 Cal.App.4th 1663, 1672.)

9

motion for a new trial:  by not ruling in a timely fashion, the motion for new trial was automatically denied.  (Code Civ. Proc., § 660.)  Baldoni's argument that the verdict is void because it was arrived at by chance is, by extension, an argument that a new trial was warranted.[4]  In reviewing the denial of a motion for new trial based on jury misconduct, the appellate court " ' " ' "has a constitutional obligation . . . to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial." ' " ' "  [Citations.]"  (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 818.)

Code of Civil Procedure section 657, which governs the relief available on a motion for a new trial, provides that "[t]he verdict may be vacated . . . on the application of the party aggrieved, for any of the following causes . . . .  2. Misconduct of the jury; and whenever any one or more of the jurors have been induced to assent to any general or specific verdict, or to a finding on any question submitted to them by the court, by a resort to the determination of chance . . . . "  (Code Civ. Proc., § 657. )  "Verdicts reached by tossing a coin, drawing lots, or any other form of gambling are examples of improper chance verdicts.  [Citation.]  'The more sophisticated device of the *quotient verdict* is equally improper:  The jurors agree to be bound by an *average* of their views; each writes the amount he favors on a slip of paper; the sums are added and divided by 12, and the resulting "quotient" pursuant to the prior agreement, is accepted

---

[4]      The alternative is to consider this argument as a direct challenge to the judgment. Such an approach would not lead to a different result.  As explained below, the evidence did not establish that there was any jury misconduct.

as the verdict without further deliberation or consideration of its fairness.' [Citation.]" (*Chronakis v. Windsor* (1993) 14 Cal.App.4th 1058, 1064.)

Baldoni relies on seven juror affidavits filed with the trial court to show that the emotional distress and punitive damages awards were the result of "quotient verdicts." The first affidavit (Juror No. 1's affidavit) was filed with Baldoni's moving papers on November 5, 2012, 10 days after his notice of intent was filed; the next three affidavits were filed on December 21, 2012; and the last three affidavits were filed on December 24, 2012. Code of Civil Procedure section 659a provides that a party moving for a new trial shall, within 10 days of filing his notice of intent, file and serve any supporting affidavits. The statute further provides that "[t]he time herein specified may, for good cause shown by affidavit or by written stipulation of the parties, be extended by any judge for an additional period of not exceeding 20 days." (Code Civ. Proc., § 659a.)

Here, only Juror No. 1's affidavit was timely filed within 10 days of the filing of the notice of intent. The other six were untimely filed over fifty days after the filing of the notice of intent. "[T]he trial court has no discretion to admit affidavits submitted" after the statutory time period has elapsed. (*Erikson v. Weiner* (1996) 48 Cal.App.4th 1663, 1672.) Accordingly, the untimely filed affidavits were not properly before the trial court and, therefore, are not part of the record on appeal or within the scope of appellate review.[5] (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1239 [" 'It has long been

---

[5]     Even if we were to construe Baldoni's appeal as raising a direct challenge to the judgment based on jury misconduct, we still could not consider these affidavits. They

11

the general rule and understanding that an "appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration." ' "].)

Juror No. 1's affidavit provides: "I voted against the jury verdict . . . . On the issue of damages, there were initially five jurors who did not want to award any damages . . . . The jury could not agree on damages so they took an average of the eleven jurors who favored liability. They literally added up everyone's figure and divided it by eleven which came to $100,000. There was no meaningful deliberation on the issue of damages. . . . The jury did the same thing when we came back to deliberate on punitive damages. They added up what everyone was willing to accept, and then divided it by eleven."

Baldoni contends that this affidavit shows that "the jury did not deliberate on damages, and engaged in a quotient verdict on both the issue of emotional distress damages and punitive damages, merely adding up the sums suggested by each juror finding liability and dividing it by eleven." However, the affidavit does not state that the jury "agree[d] to be bound by an *average* of their views." (*Chronakis v. Windsor, supra,* 14 Cal.App.4th at p. 1064.) The affidavit only provides that the jury took an average of the 11 jurors' "figure[s]" – presumably, the amount of damages each juror thought proper to award – during the deliberation process.

---

are not properly part of the trial court's record, as explained above, and Baldoni has not moved to introduce this evidence on appeal. (Cal. Rules of Court, rule 8.252(c)(1) ["A party may move that the reviewing court take evidence."])

12

We cannot infer an agreement by the jurors to accept the averaged figure as the final award (for emotional distress and punitive damages, respectively). Juror declarations are admissible to the extent that they describe overt acts constituting jury misconduct, but they are inadmissible to the extent that they describe the effect of any event on a juror's subjective reasoning process. (*In re Stankewitz* (1985) 40 Cal.3d 391, 398.) Therefore, we cannot conclude, based solely on the jury's taking of an average and subsequent lack of "meaningful" deliberation, that the jury agreed to be bound by the averaged figure.

Juror No. 1's affidavit also does not record any overt acts by the jurors whereby they agreed to accept an averaged figure as their final award. The affidavit even states that there *was* further deliberation on the issue of damages after the averaged figure was calculated. Although Juror No. 1 concluded that such further discussion was not "meaningful," it is unclear what the juror believes to be "meaningful" deliberation. Even "evidence an average figure was later rounded either up or down has been held definitive proof the jurors were not bound by their agreement to adopt the average figure as their final verdict." (*Chronakis, supra,* 14 Cal.App.4th at p. 1066.) Accordingly, Baldoni has not demonstrated that the jury improperly assented to a "quotient verdict" such that a new trial was warranted.[6]

---

[6]     Even if the other six juror declarations were properly included in the record, there was still insufficient evidence of jury misconduct. These declarations stated only that the jury "agreed to *take* an average of the sums determined by the eleven jurors who favored liability," not that the jury agreed to adopt that average figure as their final verdict. (Emphasis added.) Furthermore, these declarations stated that the jury "rounded off" the average, and "evidence an average figure was later rounded either up

3.      *The Verdict Was Supported by Substantial Evidence*

a.      *Standard of Review*

In Baldoni's cross-appeal, he argues that the trial court erred in denying his motion for judgment notwithstanding the verdict because there was no substantial evidence supporting the verdict.  " ' "The scope of appellate review of a trial court's denial of a motion for judgment notwithstanding the verdict is to determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's conclusion and where so found, to uphold the trial court's denial of the motion." ' [Citation.]"  (*Shapiro v. Prudential Property & Casualty Co.* (1997) 52 Cal.App.4th 722, 730.)  " ' "It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact."  [Citations.]' "  (*Jones & Matson v. Hall* (2007) 155 Cal.App.4th 1596, 1607.)  "We must affirm the judgment if there is any ponderable, credible evidence or reasonable inferences therefrom supporting the findings made by the jury.  [Citation.]"  (*Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1058.)

b.      *There Was Substantial Evidence of Undue Influence*

Welfare and Institutions Code section 15610.30 provides that financial abuse of an elder occurs when property is taken for a wrongful use, with intent to defraud, or by undue influence.  The version of this statute in effect at trial refers to undue influence as defined by section 1575 of the Civil Code.  Civil Code section 1575 defines undue

_____

or down has been held definitive proof the jurors were not bound by their agreement to adopt the average figure as their final verdict."  (*Chronakis, supra,* 14 Cal.App.4th at p. 1066.)

14

influence as: "(1) In the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him; (2) In taking an unfair advantage of another's weakness of mind; or (3) In taking a grossly oppressive and unfair advantage of another's necessities or distress."

"What constitutes undue influence and what constitutes sufficient proof thereof depend upon the facts and circumstances of each particular case." (*Sparks v. Sparks* (1950) 101 Cal.App.2d 129, 135.) Undue influence "involves the use of excessive pressure to persuade one vulnerable to such pressure . . . . Undue susceptibility may consist of total weakness of mind which leaves a person entirely without understanding [citation]; or, a lesser weakness which destroys the capacity of a person to make a contract even though he is not totally incapacitated . . . . " (*Odorizzi v. Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 131.)

Baldoni contends that there was no evidence that he obtained Thelma's property by undue influence.[7] However, Thelma was 79 years old when she purportedly executed the grant deed, and multiple witnesses at trial testified that she had mental deficits at that time. Neighbors testified that Thelma claimed that she saw people who weren't there, "hear[d] [] aliens in her home," was paranoid that someone was "out to get her," and "wasn't all there." Although certain witnesses did not specify *when* Thelma experienced these mental lapses, it was reasonable for the jury to infer that

---

[7]    Baldoni cites to Probate Code sections 810 and 811 in connection with this argument. However, this is a civil case, not a probate proceeding.

Thelma had experienced them throughout the time these neighbors had known her. Thelma's daughter also testified that Thelma had a "mental illness," had always been in the care of a psychiatrist, and had experienced delusions throughout her life.

Baldoni points to contrary evidence presented at trial – primarily his testimony that Thelma was not mentally impaired during the six years prior to her entry to the Woodruff Care Home and, in fact, had become "sharper" during this time. However, when reviewing a record for "substantial evidence," we " 'accept[] the evidence most favorable to the order as true and discard[s] the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. '" (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

Baldoni's testimony that Thelma had no mental impairments during this time period was directly at odds with that of her neighbors, her daughter and that of the Woodruff Care Home doctor and administrator who observed that Thelma was suffering from dementia. The jury apparently found those witnesses to be more credible than Baldoni, and we have no power to substitute a different conclusion. (*In re Ana C.* (2012) 204 Cal.App.4th 1317, 1329 ["That the [trial] court reasonably could have assessed her credibility less favorably or that our court could reasonably make a different assessment of credibility is not sufficient grounds for reversal."]) Based on this record, there was substantial evidence that Thelma experienced a severe "weakness of mind" when she purportedly signed the grant deed giving Baldoni title to her house.

Furthermore, there was substantial evidence that Baldoni took an "unfair advantage of" Thelma's "weakness of mind." (Civil Code, § 1575.) Baldoni argued

16

that Thelma wanted to give him her house because they had a close relationship. However, Baldoni's testimony that he had frequently visited Thelma was undercut by that of certain neighbors, who were neutral third parties to this dispute. Although Baldoni testified that he visited Thelma several times a week starting in 2005, multiple neighbors testified that they had never seen Baldoni prior to when he moved Thelma out of her home. In addition, although Baldoni claimed to have taken care of Thelma by hiring a woman to stay with her 30 hours a week starting in 2007, a neighbor testified that she never saw any "female companion" regularly visiting Thelma.

A neighbor also testified that Thelma was paranoid of losing her house and refused to "sign[] anything" that would transfer title to her house. This suggested that Thelma would not have volunteered to transfer her house to Baldoni, and that, in order to obtain Thelma's signature, Baldoni had exerted pressure on her. Furthermore, Baldoni's assertion that Thelma gave him her house – not in a will but as an inter vivos transfer – is inherently incredible as there was no evidence Thelma had anywhere else to live or was planning to move. Based on this record, the jury could have reasonably concluded that Baldoni had not, in fact, visited Thelma or taken care of her such that he inspired her to give away her house to him, but that, in fact, he had simply preyed on her mental deficits in order to manipulate her into signing the grant deed. Therefore, there was substantial evidence that Baldoni used undue influence over Thelma to procure her house.

c.    *There Was Substantial Evidence of Malice*

Baldoni contends that there was no evidence he acted with malice, oppression or fraud such that punitive damages were warranted.  In reviewing a punitive damages award, "[b]ecause Civil Code section 3294 requires proof by 'clear and convincing evidence' of fraud, oppression, or malice, we must inquire whether the record contains ' "substantial evidence to support a determination by clear and convincing evidence . . . . " ' [Citation.]"  (*In re Marriage of Rossi* (2001) 90 Cal.App.4th 34, 40.)  Malice, as defined in Civil Code section 3294, "means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Civil Code, § 3294, subd. (c)(1).)

Here, there was substantial evidence supporting the conclusion that Baldoni acted with malice when he took Thelma's house.  There was abundant evidence that Thelma suffered from mental illness, was delusional, and would not have voluntarily given her house to Baldoni absent undue influence.  This evidence indicated that Baldoni had manipulated Thelma into giving him her house, in conscious disregard of her property rights and of the vulnerable position Thelma was placed in by having no legal right to her house.

There was also evidence that Baldoni had concealed his takeover of Thelma's property – two neighbors testified that Baldoni misrepresented to them that he had temporarily moved Thelma to a brother's when, in fact, he had checked her into the Woodruff Care Home.  This undercut Baldoni's testimony that he had always acted out

18

of concern for Thelma, and suggested that, in fact, Baldoni knew his taking of Thelma's house was reprehensible and attempted to evade scrutiny by Thelma's neighbors. Accordingly, there was substantial evidence in support of the conclusion that Baldoni willfully manipulated Thelma into signing the grant deed in conscious disregard of her rights and safety.

d. *There Was Substantial Evidence Showing Causation*

Baldoni contends there was no evidence showing that his conduct was a substantial factor in causing harm to Thelma or that she suffered any emotional injury as a result of the transfer of her real property to Baldoni. With respect to the first argument, the transfer of Thelma's house to Baldoni deprived her of an asset, and therefore, directly caused her damages in the form of the loss of this property.

With respect to the second argument, there was substantial evidence that Thelma suffered emotional distress as a result of being deprived of her house. Thelma was "paranoid" of "losing her house." Although the evidence indicated that Thelma did not understand the import of the grant deed she signed, it was reasonable for the jury to infer that she first realized that Baldoni had taken her house when he essentially evicted her from the property and transferred her to assisted care. When Thelma was admitted to the Woodruff Care Home, she was unable to sleep, and was prescribed a medication to "calm [her] down." This suggested that Thelma was distressed at being deprived of her home. Accordingly, there was substantial evidence supporting the jury's finding that Baldoni's taking of Thelma's house harmed her and caused her emotional distress.

### DISPOSITION

The order granting a new trial is reversed.  The judgment is affirmed.  Plaintiff shall recover her costs on appeal.

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

CROSKEY, J.

WE CONCUR:

KLEIN, P. J.

KITCHING, J.