**LEATHERMAN TOOL GROUP, INC.,**
an Oregon Corporation, Plaintiff–
Appellee,

v.

**COOPER INDUSTRIES, INC.,** an Ohio
Corporation, Defendant–Appellant.

Nos. 98–35147, 98–35415.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 25, 2001.

Filed April 5, 2002.

Amended May 3, 2002.

William Bradford Reynolds and Bradley J. Schlozman, Howrey Simon Arnold & White, Washington, DC, for the defendant-appellant.

J. Peter Staples and Julianne Ross Davis, Chernoff, Vilhauer, McClung & Stenzel, LLP, Portland, OR, for the plaintiff-appellee.

Before: CANBY, and T.G. NELSON, Circuit Judges, and FOGEL, District Judge.[1]

FOGEL, District Judge.

We held previously that Appellee Leatherman Tool Group, Inc. ("Leatherman") had no protectable trade dress in the configuration of a multipurpose pocket tool where that configuration was wholly functional. We concluded, therefore, that Appellant Cooper Industries, Inc. ("Cooper") was entitled to copy that product closely in producing a competing product. *See Leatherman Tool Group v. Cooper Industries*, 199 F.3d 1009 (9th Cir.1999) (*"Leatherman I"*). However, in an unpublished memorandum disposition accompanying our prior opinion, we upheld an award of $4.5 million in punitive damages against Cooper, based upon the fact that it passed off photographs and drawings of Leatherman's product as its own when it first attempted to enter the market.

Language in our memorandum disposition suggested that we had reviewed for abuse of discretion the trial court's determination that the punitive award was not excessive. The Supreme Court has now clarified that appellate courts must review independently the constitutionality of punitive damage awards. Undertaking such a review, we conclude that the maximum award consistent with constitutional principles and the facts here is $500,000. We therefore reverse and remand to the trial court in order that it may modify the judgment accordingly.

## I.

As described in *Leatherman I* and in the Supreme Court's opinion in *Cooper Industries v. Leatherman Tool*, 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (*"Leatherman II"*), Cooper announced at a trade show in 1996 that it would produce

---

1. The Honorable Jeremy Fogel, United States District Judge for the Northern District of California, sitting by designation.

a multi-function pocket tool that was nearly identical to an existing product made by Leatherman. *Leatherman I*, 199 F.3d at 1010. The Cooper product was to be named the ToolZall, although internally it had been referred to as the "Cooperman." The Leatherman product was marketed as the "Pocket Survival Tool" ("PST"). When Leatherman originally introduced the PST it apparently created the market for such tools, and there is no dispute that the PST thereafter dominated that market.

At the time of the 1996 trade show, Cooper apparently had not yet manufactured a prototype or actual ToolZall. A Cooper employee therefore created a ToolZall "mock up" by grinding the Leatherman name off of a PST and by adding certain fasteners that were unique to the planned ToolZall. Cooper also retouched photographs and line drawings of the PST for use in its own advertising.

Shortly after the trade show, Leatherman filed the present action and obtained a preliminary injunction preventing Cooper from selling the ToolZall. Although the preliminary injunction was entered in December, 1996, there was evidence that Cooper's advertising and promotional materials based on the PST continued to appear well into 1997. As a result of the injunction, however, Cooper's gross profits from actual sales of the ToolZall in the domestic market were limited to an amount estimated at $50,000.

At trial, the jury found that Cooper's ToolZall infringed the trade dress of the PST but awarded no damages in connection with that finding. In our prior opinion we held that Leatherman had no protectable intellectual property rights in the appearance of the PST, as that appearance was the result of functional features only. *Leatherman I*, 199 F.3d at 1014.

The Supreme Court granted certiorari with respect to the standard of review we employed in the unpublished memorandum that accompanied our prior opinion. That memorandum in relevant part affirmed the jury's award of $4.5 million dollars in punitive damages arising from Cooper's improper use of the photograph of the PST. In view of the Supreme Court's decision that a de novo standard of review applies, we now reconsider the propriety of the punitive damages award.

## II.

■ As the Supreme Court noted, it has "instructed courts evaluating the consistency of a punitive damages award with due process to consider three criteria: (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Leatherman II*, 121 S.Ct. at 1687(citing *BMW of North America v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). The Court also outlined an analysis of the *Gore* criteria that might be applied to this case. It cautioned that it did not intend to "prejudge" the issue, but only to point out how an independent review might call for a result other than our prior affirmance of the punitive damage award at issue here. *Leatherman II*, 121 S.Ct. at 1682.

■ Taking the *Gore* criteria in reverse order, we believe, as the Supreme Court suggested, that Cooper's conduct likely would not have been subject to civil penalties in any amount approaching the punitive damages awarded by the jury. "[T]he unfairness in Cooper's use of the picture apparently had nothing to do with misleading customers but was related to its inability to obtain a 'mock up' quickly and cheaply. [Citation.] This observation is

more consistent with the single-violation theory than with the notion that the statutory violation would have been sanctioned with a multimillion dollar fine." *Leatherman II*, 121 S.Ct. at 1689.

In its briefing on remand, Leatherman argues that Cooper had adequate notice that "severe penalties" in the form of either statutory fines or punitive damages might be awarded under Oregon statutory and common law for unfair trade practices. However, even assuming that as a general matter "severe" awards might be appropriate in some cases, Leatherman has not shown that the award here was comparable to the amount that might have been recovered in civil penalties in a comparable case. As the Supreme Court commented, "the picture of the PST did not misrepresent the features of the original ToolZall and could not have deceived potential customers in any significant way." *Leatherman II*, 121 S.Ct. at 1688. Thus, the third *Gore* criterion does not support the jury's award.

The second *Gore* criterion requires us to consider the ratio between the size of the award and the harm "or potential harm" that was or could have been caused by Cooper's conduct. There is no genuine dispute that Cooper's conduct caused relatively little actual harm. As a result of the preliminary injunction, Cooper was unable to sell the ToolZall for more than a short period of time and realized only approximately $50,000 in gross profits.

Leatherman nonetheless urged the Supreme Court, and urges us, to look to the harm Leatherman *might* have suffered had Cooper succeeded in its wrongful conduct. Leatherman relies on an estimate of gross profits that Cooper might have realized had it been able to sell the ToolZall. However, as the Supreme Court pointed out, it would be "unrealistic" to assume that all of Cooper's sales of the ToolZall would have been attributable to its misconduct in using the photograph of the PST. *Leatherman II*, 121 S.Ct. at 1688.

Moreover, Leatherman's proposed conclusion that Cooper's anticipated gross profits are an appropriate measure of the potential harm rests in large part upon the erroneous premise that the copying itself, as distinguished from the inappropriate use of the modified PST, was improper. As we held previously, the wrongfulness of Cooper's conduct lay in the fact that it obtained a "head start" by using a modified PST photograph in its advertising rather than taking the additional time and expense to produce its own mock up, prototype, or actual production ToolZall. Leatherman has pointed to no testimony in the record, and we have found none, that attempted to quantify directly the economic advantage Cooper could have realized by taking this short cut.

We can infer from the evidence, however, that it was economically and competitively important for Cooper to be able to announce its product at the 1996 trade show. We find it difficult to believe that it would have been *impossible* for Cooper to have obtained a legitimate mock up in time for that show, but we reasonably can infer that it might have incurred far greater costs in doing so. Leatherman urges us to infer further that had Cooper not been able to introduce the ToolZall at the 1996 trade show, it would have been forced to wait until that show was held again in 1997, depriving it of a full calendar year of profits. Such an inference, however, would require impermissible speculation, both as to what Cooper could or would have presented at the 1996 trade show had it not chosen to take the short cut and as to how long it would have taken Cooper to get its product to market had it missed that show. While we do not wish to reward Cooper for its improper conduct, neither can we guess as to what greater

expenses, delays, or lost sales it might have incurred had it acted properly.

We are left, then, with the jury's finding that Leatherman suffered $50,000 in actual damages from the passing off. The ratio between those damages and the amount of punitive damages awarded is 90 to 1. While the Supreme Court has declined to set a maximum ratio of punitive to actual damages, and we likewise decline to do so, this ratio is only somewhat less "breathtaking" than that invalidated by the Supreme Court in *Gore. See Gore,* 116 S.Ct. at 1603;. *but cf. Johansen v. Combustion Engineering, Inc.,* 170 F.3d 1320, 1337, 1339 (11th Cir.1999) (upholding a ratio of approximately 100 to 1). Thus, we are convinced based upon our independent review that there is insufficient evidence in the record with respect to the harm or potential harm caused by Cooper's conduct to support the punitive damages award under the second *Gore* criterion.

 We address the first *Gore* criterion last because it presents the most difficult question for an appellate court. What is the degree of reprehensibility of the defendant's misconduct? The Supreme Court acknowledged that with respect to this question, "district courts have a somewhat superior vantage over courts of appeal." *Leatherman II,* 121 S.Ct. at 1688. The Supreme Court further warned that despite its holding that we must review the district court's application of the *Gore* test de novo, we still must "defer to the district court's findings of fact unless they are clearly erroneous." *Id.* at 1688 n. 14. Although determining the "degree of reprehensibility" ultimately involves a legal conclusion, we must accept the underlying facts as found by the jury and the district court. *See Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Corp.,* 272 F.3d 1335 (Fed.Cir.2001) ("to the extent that the judgment-call on reprehensibility can be traced to a jury's assessment of witnesses,

independent appellate review is essentially meaningless.").

In its discussion of this *Gore* criterion, the Supreme Court noted that:

[w]hen the jury assessed the reprehensibility of Cooper's misconduct, it was guided by instructions that characterized the deliberate copying of the PST as wrongful. The jury's selection of a penalty to deter wrongful conduct may, therefore have been influenced by an intent to deter Cooper from engaging in such copying in the future. Similarly, the District Court's belief that Cooper acted unlawfully in deliberately copying the PST design might have influenced its consideration of the first *Gore* factor.

*Id.,* at 1688.

The record reflects, however, that the district court instructed the jury expressly that any award of punitive damages must be related to the Leatherman's passing off claim and not to the alleged claim of trade dress infringement. As we did in our previous memorandum disposition, we must presume the jury understood and followed the instructions.

Moreover, the question before us is *not* whether the jury's award was inflamed by prejudice or passion, but whether the amount of punitive damages ultimately awarded was constitutional under the circumstances. We therefore decline to speculate whether the jury might have been motivated in part by its distaste for Cooper's lawful copying of the PST. We conclude instead that, even assuming that the jury considered only the improper passing off, its punitive damages award exceeded constitutional limits.

In our prior memorandum disposition, we expressed our strong disapproval of Cooper's conduct. We recognized the unfairness in Cooper's use of Leatherman's work to promote its own product, and we

acknowledged serious doubts as to whether Cooper fulfilled its legal obligations under the preliminary injunction in a diligent manner. Cooper now urges us view its belated compliance with the injunction as the " 'arguably inadvertent' " conduct of its resellers and distributors, and to view its own conduct as involving only "negligence rather than trickery and deceit."

We still cannot condone Cooper's conduct. But, as we indicated previously and as the Supreme Court acknowledged, this simply is not a case in which there is evidence of any significant actual harm to consumers or to Leatherman. Cooper's conduct was more foolish than reprehensible. After independent review, we thus conclude that application of the first *Gore* factor does not support the jury's award.

### III.

■ Having concluded that the *Gore* factors do not support the award, we have considered whether we simply should determine the maximum constitutional award ourselves or remand to the district court with instructions to issue a remittitur in accordance with the views expressed in our opinion. Cooper asks that we determine the maximum award, while Leatherman somewhat equivocally suggests that further findings at the district court level might be helpful.[2]

■ Absent clear authority or even argument from the parties to the contrary, we see no reason to disagree with the Eleventh Circuit's opinion in *Johansen, supra*, 170 F.3d 1320, that an appellate court need not remand for a new trial in every case in which it finds that a punitive damages award exceeds the constitutional maximum. That conclusion usually follows from the fact that a plaintiff would not be entitled to any *greater* award on remand and therefore cannot be aggrieved. *See id.* at 1332 n. 19. There may be cases in which there has been a prior remittitur by the trial court or some other circumstance that makes further findings necessary, but no such circumstances are present here. We therefore will determine the constitutional maximum on the basis of the existing record.[3]

As we previously stated, the district court considered Cooper's corporate wealth in finding that the amount of the punitive damages award was necessary to deter Cooper from similar conduct in the future. The Supreme Court suggested that an assessment of the deterrent effect of a particular amount of might be considered a "factual" finding. *Leatherman II*, 121 S.Ct. at 1687. However, the Court's opinion then appears to have discounted the importance of this point, noting that, "juries do not engage in such a finely tuned exercise of deterrence calibration when awarding punitive damages" and further noting that punitive damages serve purposes other than deterrence. *Id.*

---

2. Leatherman indicates in its briefing that it could present additional evidence of the circumstances surrounding Cooper's conduct. It does not explain, however, why such evidence was not or could not have been presented to the district court originally, particularly in view of the fact that the district court addressed and made findings as to the propriety of the punitive damages award.

3. We note that after the briefing on remand in this case, we issued *In re Exxon Valdez*, 270 F.3d 1215 (9th Cir.2001), in which we also found that a punitive damage award exceeded the constitutional maximum. The district court in that case did not have the benefit of either *Gore* or *Leatherman II* at the time of trial, and we remanded to the district court so that it could conduct the constitutional analysis with respect to the maximum permissible award "in the first instance." *Id.* at 1241. Nothing in *Exxon Valdez*, however, suggests that an appellate court is *required* to remand to the district court where, as here, it appears that judicial economy and the interests of justice would be served by disposing of the issue at this level.

The potential deterrent effect of a punitive damages award is not mentioned expressly in the *Gore* criteria, although it has continued to be considered in post-*Gore* cases. *See, e.g., Johansen, supra,* 170 F.3d at 1338. Here, we acknowledge that the evidence would support a finding that a substantial punitive award might be necessary to have a sufficient economic effect on Cooper to create deterrence. On the basis of the record as a whole, however, and in view of the *Gore* factors, we cannot conclude that this consideration renders the amount awarded by the jury constitutional.

We turn, then, to the amount of an award that we believe comports with constitutional requirements. In *Inter Medical Supplies v. EBI Medical Systems,* 181 F.3d 446 (3rd Cir.1999), the court aptly described the difficulties an appellate court faces in reviewing a punitive damages award. "It is not an enviable task. We have searched vainly in the case law for a formula that would regularize this role, but we have not found one .... In the last analysis, an appellate panel, convinced that it must reduce an award of punitive damages, must rely on its combined experience and judgment. When different members reach different figures, they must seek an accommodation among their views, a process that recurs throughout appellate decision making." *Id.* at 468.

Like the *Inter Medical* court, we have reached our conclusion "after reviewing the record and the arguments." *Id.* We conclude that the maximum award of punitive damages consistent with due process on the facts of this case is $500,000. We reach this conclusion for all of the reasons we have discussed above, but particularly because we believe that the conduct at issue warrants a sanction that is not trivial, but also is not disproportionate to the harm caused or threatened.

REVERSED AND REMANDED.