Filed 4/15/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CARLOS RAMON RUBIO et al., | B300021 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. BC545112) |
| v. | |
| CIA WHEEL GROUP et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Randolph Hammock, Judge. Affirmed.

Pillsbury Winthrop Shaw Pittman, Stacie D. Yee and Justin L. Brossier for Defendants and Appellants.

V. James DeSimone Law, V. James DeSimone and Carmen D. Sabater for Plaintiffs and Respondents.

———————————

CIA Wheel Group dba The Wheel Group (CWG) and Wheel Group Holdings dba The Wheel Group (Holdings) appeal from a judgment entered against them after a bench trial in a wrongful termination action brought by former employee Maria Teresa Lopez. Lopez alleged, inter alia, that CWG terminated her in violation of public policy because she had cancer. Lopez died during the first trial of this matter, and the court declared a mistrial. The court appointed Lopez's three children (hereafter plaintiffs) as her successors in interest. Following a second trial, the court found CWG terminated Lopez due to her medical condition, awarded plaintiffs $15,057 in economic damages, and added Holdings as a judgment debtor as the alter ego of and/or successor in interest to CWG, which had been dissolved. The court determined punitive damages were warranted, found Lopez's noneconomic damages to be in the $100,000 to $150,000 range but not recoverable by plaintiffs after her death due to the provisions of Code of Civil Procedure section 377.34,[1] and awarded punitive damages in the amount of $500,000 against appellants.

Appellants contend: 1) the punitive damages award is constitutionally excessive because it is 33 times the amount of the economic damages award; 2) the punitive damages award is excessive under California law; 3) the trial court erred in considering Holdings's financial condition in determining the amount of punitive damages; and 4) substantial evidence does not support the trial court's finding that an officer, director or managing agent of CWG acted with fraud, oppression or malice,

_____

[1] All further undesignated statutory references are to the Code of Civil Procedure.

2

or that any such conduct was ratified by CWG.  We affirm the judgment.

## BACKGROUND

In about May 2011, Lopez began work as a sales representative for CWG.  She worked with two other sales representatives, Gaspar Vasquez and Melvin Amaya. Lopez worked primarily in the office while Vasquez and Amaya were in the field.  The three representatives were supervised by A.J. Russo.  All four were based in CWG's office in Los Angeles, which was responsible for sales in several southwestern states.

In October 2012, Lopez learned she had cancer and took a three-month medical leave from CWG for surgery.  She returned to work full-time in January 2013.  Beginning in February 2013, she underwent chemotherapy once every three weeks.  By August 2013, she had completed chemotherapy but still had follow-up medical appointments about twice a month.  In November 2013, CWG terminated Lopez's employment.  Russo stated the termination was performance related, but Lopez believed she was being terminated because she had cancer.

I. ***Lopez's Termination After Medical Leave and Chemotherapy Appointments***

When Lopez was terminated, her personnel file did not include any written performance warnings or disciplinary actions.  In 2011, 2012, and 2013, Lopez was the highest producing sales person in the Los Angeles office.  When she was fired, she had higher sales numbers than the other two sales representatives.

Emails between Russo and Lopez showed that before Lopez took her medical leave, Russo praised her work and was

3

agreeable when she asked for time off. They had a good relationship.

After Lopez returned from medical leave, Russo made negative comments to her and the other employees about Lopez taking time for medical appointments. He would roll his eyes and breathe heavily as if frustrated. Russo began to complain about Lopez's behavior, particularly that she took a morning coffee break, which had not caused a problem before her medical leave. He began treating her differently than the other two sales representatives. For example, he kept asking her for more detail on her call logs, even though she included more detail than Vasquez. Vasquez testified at trial that he only put a few words on his call logs and never received an email asking for more detail. Russo began taking credit for Lopez's sales, and when she confronted him, he told her it did not matter who was credited for the sales. Vasquez testified Russo also took credit for some of Vasquez's sales, but when Vasquez confronted Russo, he changed the name on the sale without argument.

Lopez felt significant stress because of Russo's behavior and sought assistance from CWG's Human Resources department. She told Arnex Casar, the Human Resources manager, that Russo picked on her but not on other sales representatives. Casar told her she should not "bump heads" with her supervisor.

Casar did not document Lopez's complaint. He acknowledged at trial that Lopez had told him Russo was not being fair and was favoring other employees, and that Russo was switching accounts. He also admitted he told her it was not a human resources matter and she should sit down and talk to Russo. Casar did not raise the matter with Russo.

4

Casar had the responsibility to ensure CWG's policies were followed in termination decisions, and he had the ability to stop terminations. Several months later, when Russo told Casar he intended to terminate Lopez because her sales were down, Casar did not check to see if this was true. In Lopez's file Casar did not find any written warnings, coaching, or notices to improve. Casar was aware Lopez had taken a medical leave. He nevertheless, in his discretion, allowed Russo to terminate Lopez in violation of CWG's policy, which required a warning, ordinarily in writing, before termination.

Neither did Russo meet resistance to firing Lopez from Paul Yang, Executive Vice President of CWG and son of the owner of the company. Yang oversaw human resources, and his approval was required for employee terminations. Russo told Yang Lopez's sales numbers were down. Although Yang oversaw the accounting department, he did not check to see if Russo's statement was accurate. Yang did not speak to Casar, the human resources manager, about the termination. Yang did not check Lopez's file for warnings or disciplinary problems. He simply accepted Russo's recommendation. At trial, Yang testified Russo had told him in August or September that Lopez was not submitting her call logs or the logs were deficient. Yang did not check to see if this was true.

The actual paperwork produced by CWG for the termination stated Lopez was terminated for "insufficient job performance . . . no effort put towards duties." Russo, however, gave varying reasons for the termination throughout the pendency of this litigation. In his deposition, Russo stated Lopez was terminated "mainly because her performance was slipping." Lopez's "sales numbers were going down . . . I mean, that was the

main reason, was her sales numbers were going down." He did not recall communicating any other reason to her.

Before the first trial, Lopez's sister Marisela Lopez, who also worked at CWG, obtained documents from CWG showing Lopez's sales numbers were not declining. Russo then testified at the first trial that Lopez was terminated because "the effort put in towards gaining more business and being a salesperson was declining."

In the second trial, Russo testified he terminated Lopez because she "was not meeting her ability to cold call and to close new customers." He claimed he ran a report with orders pending in her name and went through each account to verify his impression Lopez was not performing well. However, he could not produce documentation of this report for the court. Russo also claimed Lopez's call logs had much less detail than Vasquez's and Amaya's call logs. When the court asked to see the call logs, Russo said he did not have them.

## II. *Lopez's Cancer*

At the first trial Lopez testified she lost her hair due to chemotherapy, wore a wig or scarves to work, and walked more slowly. Former co-worker Vasquez testified Lopez "was losing weight, she was pale, she was using scarves." Her physical appearance was consistent with having cancer. She seemed a little sicker toward the last few months of her employment. It took her longer to walk from her desk to the warehouse. Lopez's sister Marisela testified Lopez lost weight, lost her hair and wore wigs or scarves due to the chemotherapy. She walked a little bit more slowly.

Lopez sat side by side in cubicles with Vasquez, Russo, and Amaya, the other sales representative. Casar came to the sales area at times to speak to Russo. Yang walked through the sales area to reach one of the executive offices three to four times a day.

Vasquez discussed Lopez's cancer with his coworkers when Russo was present in the cubicles. Further, Vasquez testified Russo told him and Amaya that Lopez had cancer. This occurred about two to three months before Lopez was fired.

Marisela testified other coworkers would speak to her about Lopez having cancer when they noticed she was wearing wigs. Marisela believed it was common knowledge in the office that Lopez had cancer.

Marisela herself discussed Lopez's medical condition with Casar and Russo. She testified that when Lopez took medical leave, Marisela told Casar Lopez "had cancer, that she was going to need chemo after [her] surgery, that she was going to lose all of her hair." She told Casar this "so he could let [Russo] know about [Lopez's condition]." Casar told her not to worry. Marisela did not directly discuss Lopez's cancer with Russo, but she told him that when Lopez returned, "she was going to need chemo."

Russo nevertheless denied "knowing" Lopez had cancer. Even when asked "You had no idea that she had cancer?" Russo replied, "No." It was only under detailed questioning by the court that Russo acknowledged he had heard "office banter" that Lopez had cancer and so had a "suspicion" she had cancer. He still claimed not to have seen anything about her appearance suggestive of cancer. Russo insisted all he "knew" was that Lopez took a medical leave and then took time off for medical

appointments. He claimed not to remember Marisela telling him Lopez had chemotherapy appointments.

Cesar, too, denied "knowing" Lopez had cancer. The trial court explicitly reminded Cesar he was under oath and then asked him if it was his testimony "under oath" that he did not know Lopez had cancer. Cesar again disavowed knowledge. The court then asked why Cesar believed Lopez needed medical leave "for three months? A cold?" Cesar replied, "In the back of my mind, I thought it was cancer." Cesar denied Marisela told him Lopez would need chemotherapy appointments. Eventually, Cesar acknowledged he "assumed" Lopez had cancer "by the way she looked." He noticed she "was losing weight and she wear[s] wigs at times."

Yang was adamant he did not know or suspect Lopez had cancer. He assumed she had a serious medical condition because she took a medical leave. He acknowledged noticing she lost weight and wore scarves after returning from her leave.

III. ***Lopez's Life After CWG***

About four months after she was terminated from CWG, Lopez found another job in sales. In August 2014, Lopez's new company changed its pay structure and she no longer received commissions. She left that position. Although Lopez looked for another position, she could not find one. Marisela testified Lopez looked sick at this time.

Between August 2014 and September 2015, Lopez lived with her "husband" who was employed. She was a homemaker and raised her 14-year-old daughter. For reasons that are not clear, at some point after September 2015, Lopez had to move out of her apartment and into her mother's garage. It appears she

8

was quite sick when she moved.  Marisela believed that by October 2015, Lopez was too sick to work at all.

## IV.  *Holdings's Role in the Litigation*

Before trial began, plaintiffs learned CWG had been dissolved in 2015, and the company using the dba The Wheel Group was Holdings.  Plaintiffs filed a motion to add Holdings as a Doe defendant.  At the conclusion of the liability phase, the trial court added Holdings as a judgment debtor as an alter ego of or successor to CWG.  This made Holdings liable for the $15,057 in economic damages awarded to Lopez and any punitive damages.

The trial court found CWG's conduct warranted punitive damages and scheduled a trial to take evidence relevant to the amount of the award.  The court permitted plaintiffs to introduce evidence of Holdings's financial condition.  The court did not allow evidence of CWG's prior financial condition.  The court also heard testimony from Marisela about her sister's emotional distress due to her wrongful termination.

The court found Lopez suffered emotional distress damages in the $100,000 to $150,000 range which were not recoverable due to section 377.34.  Taking that harm into account, the trial court awarded plaintiffs $500,000 in punitive damages.

## DISCUSSION

## I.  *The Punitive Damages Award Is Not Constitutionally Excessive.*

"The due process clause of the Fourteenth Amendment to the United States Constitution places constraints on state court awards of punitive damages.  (See *State Farm Mut. Automobile*

9

*Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–418 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*); *BMW of North America v. Gore* (1996) 517 U.S. 559, 568 [134 L.Ed.2d 809, 116 S.Ct. 1589] (*BMW*).) We recently explained the basis of these constraints: 'The imposition of "grossly excessive or arbitrary" awards is constitutionally prohibited, for due process entitles a tortfeasor to " 'fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.' " [Citation.]' (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*).)" (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712 (*Roby*).)

"In *State Farm,* the high court articulated 'three guideposts' for courts reviewing punitive damages: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' (*State Farm, supra,* 538 U.S. at p. 418; see also *BMW, supra,* 517 U.S. at p. 575.)" (*Roby, supra,* 47 Cal.4th at p. 712.)

We review a punitive damages award "de novo, making an independent assessment of the reprehensibility of the defendant's conduct, the relationship between the award and the harm done to the plaintiff, and the relationship between the award and civil penalties authorized for comparable conduct. [Citations.] This '[e]xacting appellate review' is intended to ensure punitive damages are the product of the ' " 'application of law, rather than a decisionmaker's caprice.' " ' " (*Simon, supra,* 35 Cal.4th at p. 1172.) "[F]indings of historical fact made in the trial court are

still entitled to the ordinary measure of appellate deference." (*Ibid*.)

Appellants contend the punitive damages are excessive because their conduct was not particularly reprehensible; the punitive damages are 33.3 times the amount of the economic damages award; and certain repealed or inapplicable civil penalties weigh in favor of a lower punitive damages award.

We agree that a punitive damages award based on such a large multiplier would be troubling. Plaintiffs contend, however, that the comparison should be to the total harm caused by appellants, which included $100,000 to $150,000 in noneconomic harm plaintiffs could not recover after Lopez's death due to the provisions of section 377.34.[2] Such a comparison would result in a multiplier of 3.3 to 5. As did the Court in *Simon*, we consider this claim of actual harm first.

A.  *The Trial Court Properly Considered Harm to Lopez Beyond Her Economic Damages.*

As the California Supreme Court explained in *Simon*: "United States Supreme Court precedents appear to contemplate, in some circumstances, the use of measures of harm beyond the compensatory damages. Thus in *State Farm,* discussing the second *BMW* 'guidepost,' the high court spoke repeatedly of a

_____

[2]  Section 377.34 provides: "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement."

11

proportionality between punitive damages and the harm or 'potential harm' suffered by the plaintiff.  (*State Farm, supra,* 538 U.S. at pp. 418, 424.)  At another point (*id.* at p. 426), the court referred to the relationship between punitive damages and both 'the amount of harm' and 'the general damages recovered,' impliedly recognizing that these two are not always identical.  More explicitly, in *State Farm* the high court reiterated its recognition in *BMW* that in some cases compensatory damages are not the definitive quantification of harm because ' "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine " ' (*State Farm, supra*, at p. 425, quoting *BMW, supra,* 517 U.S. at p. 582.)  [¶]  *State Farm's* reference to potential harm echoed the high court's earlier decision in *TXO Production Corp. v. Alliance Resources Corp.* [(1993)] 509 U.S. 443 (*TXO*)."  (*Simon, supra,* 35 Cal.4th at p. 1173.)  As the *Simon* Court recognized, "[i]n the wake of *TXO, BMW* and *State Farm,* a large number of federal and state courts have, in a variety of factual contexts, considered uncompensated or potential harm as part of the predicate for a punitive damages award."  (*Simon,* at p. 1174.)

　　*Simon* discussed with apparent approval two California cases which considered unrecoverable damages for emotional distress in assessing the relationship between the plaintiff's compensatory damages award and the amount of punitive damages.  The Court cited "*Neal v. Farmers Ins. Exchange* [(1978)] 21 Cal.3d 910, in which a statute barred recovery of damages actually caused by the defendant's tortious acts.  In that insurance bad faith case, the plaintiff died before judgment, precluding her estate's recovery of damages for emotional distress.  (*Id.* at p. 920, fn. 3; see Code Civ. Proc., § 377.34

12

(formerly Prob. Code, § 573).) Considering it 'likely that absent this limitation plaintiff would have recovered a substantial additional amount in compensation for emotional distress,' this court held the disparity between the relatively small compensatory damages award and the significant award of punitive damages did not require nullification of the latter under state law. (*Neal v. Farmers Ins. Exchange, supra,* at p. 929; see also *Romo v. Ford Motor Co.* [(2003)] 113 Cal.App.4th [738,] 760-761 [reaching similar conclusion under *State Farm*].) Farmers' bad faith conduct had actually caused Mrs. Neal substantial emotional distress; her estate was barred from recovering such damages only by Probate Code former section 573." (*Simon, supra*, 35 Cal.4th at pp. 1176–1177.)

That is precisely the situation in this case. The trier of fact found appellants caused Lopez significant noneconomic damages which plaintiffs could not recover due to section 377.34.

Appellants contend that the above-quoted statements from *Simon* are dicta. Perhaps.[3] They also contend that Lopez has not

_____

[3] " 'Dicta consists of observations and statements unnecessary to the appellate court's resolution of the case.'" (*Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158.) The Court in *Simon* first considered whether it was permissible to consider the potential or uncompensated harm suffered by a plaintiff as the predicate for a punitive damages award and then, after finding support for that proposition in Supreme Court decisions, determined that "the potential harm that is properly included in the due process analysis is ' "harm *that is likely to occur from the defendant's conduct.*" ' " (*Simon, supra*, 35 Cal.4th at pp. 1173-1174, 1177, citing *TXO, supra*, 509 U.S. at p. 460.) The Court then found Simon's potential lost profits did not meet

13

cited any California case since *Simon* which has considered uncompensated damages as the predicate for a punitive damages award. The reverse is also true: appellants have not cited any California case since *Simon* reversing a punitive damages award because it was predicated on uncompensated damages.

Appellants do not point to any flaw in the *Simon* court's reasoning, or any inconsistency with U.S. Supreme Court decisions, and we see none, at least as that reasoning is applied to the case of an individual who suffers noneconomic damages but dies before trial in California.

Noneconomic damages are recoverable in many actions, including wrongful termination actions. Thus, when appellants terminated Lopez, they were on notice they would be responsible for both economic and noneconomic damages if she successfully sued them for wrongful termination. They accordingly had fair notice that if their conduct warranted punitive damages, the amount of those damages would be based on Lopez's total compensatory damages, both economic and noneconomic.

The trial court made clear that if Lopez had survived, the court would have awarded her substantial noneconomic damages. The only reason that appellants were not liable for those damages was Lopez's untimely death and a provision of California procedural law. There is nothing in the due process clause or the reasoning of *BMW*, *TXO* or *State Farm* which suggests that a defendant's wrongful actions are less culpable, or

_____

this due process standard. (*Simon,* at p. 1179.) It is not clear that the *Simon* Court's initial discussion of the constitutional permissibility of considering potential or uncompensated harm was unnecessary to the resolution of the case.

14

should be punished less severely, simply because the plaintiff dies before trial.

Appellants contend that even if it were acceptable to consider noneconomic damages, there is no reliable evidence that Lopez suffered noneconomic damages because apart from "Lopez's sister's unlicensed and layperson opinion testimony that Ms. Lopez was 'sad' and 'depressed' after being terminated, there is no evidence of any psychological examinations, treatment, medications or disability."

Appellants provide no legal authority requiring expert testimony to support non-economic damages. Generally, the law is to the contrary. "Numerous cases approve the award of emotional distress damages based on the testimony of nonexpert witnesses." (*Knutson v. Foster* (2018) 25 Cal.App.5th 1075, 1096.) "The law in this state is that the testimony of a single person, *including the plaintiff*, may be sufficient to support an award of emotional distress damages." (*Ibid.*)

Appellants also understate the lay evidence presented at trial. Lopez herself testified at the first trial that she was in "disbelief" and felt "betrayed" by the termination. In the punitive damages phase of this trial, the trial court agreed that "[b]eing fired for some bogus reason, obviously, can create emotional distress for her as [opposed to] leaving on her own terms. So that is where . . . the non-economic damages that were not awarded to her were justified and they should think about that as a factor" in punitive damages. Thus the trial court, sitting as the trier of fact, agreed to hear additional testimony on the issue of emotional distress from "any . . . witnesses . . . that have first-hand knowledge of what they saw and what they observed comparing before and after."

15

Plaintiffs' counsel offered the testimony of Lopez's sister Marisela who testified: "I knew my sister and I knew how she was feeling and I knew what she told me." Marisela explained that before Lopez was terminated, she was a very happy, "very going out person." She loved her job. Marisela observed Lopez right after she was terminated and she was "sad." She told Marisela that she believed that she had been fired because she was ill and she was "devastated." In the days and weeks after the termination, she "became stressed very emotionally" and she was "depressed" and "sad" because she was fired due to her illness. After Lopez was fired and she became depressed, she "didn't want to do anything. She wanted to stay home all the time. She didn't want to talk to nobody." Lopez expressed "financial worries." She told her sister that she "couldn't sleep." Even after Lopez got another job, she was still depressed about being fired by appellants.

The trial court expressly found Marisela to be "a very credible witness." The testimony of Lopez and Marisela is more than sufficient evidence to support the trial court's finding that "the *actual* harm suffered by the decedent (if she had been alive at the time of trial, and hence, would have been allowed to recover 'non-economic' damages) was in the *total* range of $100,000 to $150,000 for all compensatory damages." It should be emphasized that the trial court was the trier of fact in this case, and was not speculating about what a jury might have awarded Lopez if she had lived through the first trial. The court was stating what it would have done, based on the evidence in the case, if such damages had not been barred after Lopez's death by section 377.34.

Appellants alternatively insist that there is no evidence that Lopez "was emotionally impacted by her termination to any greater degree than what any employee would experience after termination for performance related or economic reasons." Appellants appear to be suggesting a very odd standard, which would hold employers liable for damages caused by wrongful termination of an employee only if the employee suffered emotional distress exceeding that suffered by "any" employee who was lawfully terminated. Appellants do not support this suggestion with cogent argument or legal authority. They have forfeited this claim. (*United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 146 (*United Grand*) [" 'appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record' "].)

Certainly, there is no requirement that a wrongfully terminated employee show she suffered more economic damages than a lawfully terminated employee before she can recover economic damages. There is, for example, no requirement that she be unemployed for longer than a lawfully terminated employee. The law does not appear to set such a rigid standard for noneconomic damages either. (See, e.g., *Loth v. Truck-A-Way Corp.* (1998) 60 Cal.App.4th 757, 768 (*Loth*) [there is no set "standard for determining pain and suffering damages [citation], [and] no expert may supply a formula for computing . . . the value of the loss of enjoyment of life"]; CACI No. 3905A ["No fixed standard exists for deciding the amount of these noneconomic damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense"].)

To the extent appellants contend there is insufficient evidence to support the amount of the noneconomic damages, the amount of such damages is left to the sound discretion of the trier of fact, here the court.  (See, e.g., *Beagle v. Vasold* (1966) 65 Cal.2d 166, 172 [" '[t]ranslating pain and anguish into dollars can, at best, be only an arbitrary allowance, and not a process of measurement' "; the trier of fact must " 'allow such amount as in [its] discretion [it considers] reasonable' " for that purpose]; *Loth, supra*, 60 Cal.App.4th at p. 768; see also CACI No. 3905A ["No fixed standard exists for deciding the amount of these noneconomic damages.  You must use your judgment to decide a reasonable amount based on the evidence and your common sense"].)  Appellants have failed to offer any argument that setting the amount of non-economic damages here was an abuse of discretion, that is, outside the bounds of reason and common sense.

B.    *There Are No Comparable Civil Penalty Provisions.*

We skip next to the third guidepost, which directs us to "consider 'the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' " (*Roby, supra*, 47 Cal.4th at p. 718.)  " 'The rationale for this consideration is that, if the penalties for comparable misconduct are much less than a punitive damages award, the tortfeasor lacked fair notice that the wrongful conduct could entail a sizable punitive damages award.' " (*Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1290.)

Appellants contend 1) there are no applicable civil penalties in comparable cases; and 2) we should consider repealed and inapplicable penalties.

18

Appellants point to Government Code former section 12970 which, when *Roby* was decided, authorized the California Fair Employment and Housing Commission to assess a fine of up to $150,000 against an employer found to violate the California Fair Employment Housing Act if the plaintiff pursued her claims administratively before the commission. (*Roby*, *supra*, 47 Cal.4th at pp. 718–719.) In 2013, the California Legislature eliminated the Fair Employment and Housing Commission, repealed section 12970, and did not replace the civil penalty authorized by section 12970 with a comparable one. (See Sen. Bill No. 1038 (2011-2012 Reg. Sess.) § 50.) We note the Court in *Roby* approved a punitive damages award of almost $2 million dollars despite the cap on administrative fines still in effect during the pendency of that action. (See *Roby*, at p. 719.)

Appellants also point to the $50,000 limit on punitive damages contained in Title VII of the Civil Rights Act. (42 U.S.C.S § 1981a(b)(3)(A).) Lopez did not bring a claim under that law, and appellants do not discuss the substantive provisions of that law or how it would apply to Lopez's circumstances. Accordingly, we do not consider it. *(See Hodjat v. State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 10 (*Hodjat*) ["appellant is required to not only cite to valid legal authority, but also explain how it applies in his case"].)

Because appellants have not identified any civil penalty that could be imposed in a comparable case, the third guidepost is not relevant in determining whether the punitive damages award in this case exceeds the constitutional limit. (See *Nickerson v. Stonebridge Life Ins. Co.* (2016) 5 Cal.App.5th 1, 23.)

C.    *Appellants' Conduct Was Reprehensible.*

Although we consider the second guidepost last, the degree of reprehensibility of a defendant's conduct is the most important of the three.  The trial court found appellants' conduct to be "despicable and reprehensible."  Appellants contend their conduct does not support a finding of a high degree of reprehensibility.  We find a medium high degree of reprehensibility.

"On this question, the high court instructed courts to consider whether '[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' " (*Roby*, *supra*, 47 Cal.4th at p. 713.)

On appeal, " 'determining the "degree of reprehensibility" ultimately involves a legal conclusion.' " (*Simon*, *supra*, 35 Cal.4th at p. 1172, quoting *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.* (9th Cir. 2002) 285 F.3d 1146, 1150.) "[F]indings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference." (*Simon*, at p. 1172.)

### 1.    First factor

Harm to an employee's emotional and mental health is considered physical harm within the meaning of the first factor. (*Roby, supra*, 47 Cal.4th at p. 713.)  The trial court found Lopez suffered such harm, and we have determined the trial court's

20

finding is supported by substantial evidence.[4]  This evidence shows that Lopez was deeply affected by CWG's wrongful conduct and essentially lost her enjoyment of life and became a different person.  Although we do not agree with appellants that some physical manifestation of emotional harm is required, we note that there was evidence that Lopez experienced difficulty sleeping, which is a physical manifestation of her emotional harm (and one which results in physical harm to a person).  Thus, this factor is present and weighs in favor of a high assessment of reprehensibility.

### 2. Second factor

When it is objectively reasonable to assume an employer's wrongful conduct toward an employee will affect the employee's emotional well-being, that conduct will be found to have " 'evinced an indifference to or a reckless disregard of the health or safety of others' " within the meaning of the second factor. (*Roby*, *supra*, 47 Cal.4th at p. 713.)  We find it objectively reasonable to assume that falsely telling a hard-working competent employee that she is being fired for poor performance would affect the employee's emotional well-being.  As the trial court put it:  "Being fired for some bogus reason, obviously, can create emotional distress."  The conduct is particularly callous when the person is suffering from cancer.  Thus, this factor is present as well and supports a high assessment of reprehensibility.

---

[4]    We would reach the same conclusion if we independently reviewed the evidence in this case.

### 3. Third factor

When the employee is a relatively low level one, she will certainly be financially vulnerable. (*Roby, supra*, 47 Cal.4th at p. 713 [low-level employee who quickly depleted her savings and lost her medical insurance as a result of termination " 'had financial vulnerability.' "]  Here, Lopez was a fairly low level employee.  She sought new employment after her termination by appellants despite her illness because she *needed* income and health insurance.  Appellants are correct that Lopez received financial assistance from family members, but this underlines Lopez's financial vulnerability:  it supports an inference that her own financial resources were insufficient to support herself after her termination.  Similarly, Lopez's financial condition may have improved some ten months after she was fired by CWG, when she was able to quit her low-paying new job and be a homemaker, but this improvement was temporary.  Lopez spent the end of her life sleeping in her mother's garage.[5]  Thus, Lopez had a fair degree of financial vulnerability when she was terminated by appellants, which supports a high assessment of reprehensibility.

### 4. Fourth factor

There is some ambiguity in the fourth factor, which asks if "the conduct involved repeated actions or was an isolated incident."  There was no evidence that any other employee was wrongfully terminated by CWG, and so in that sense there were

---

[5]  Appellants are correct they cannot reasonably be held accountable for whatever personal circumstances resulted in Lopez losing financial support from her "husband."  We include this information to show that Lopez was and remained financially vulnerable without employment.

no repeated actions by CWG.  At the same time, this cannot be viewed as an isolated incident within the company by a single employee. Russo did not act alone.  CWG's policy required acquiescence by human resources in the termination.  It also required Yang's approval.  Thus, both Casar and Yang separately acted in the wrongful termination.  Ultimately, however, this factor does "not support a high assessment of reprehensibility."  (See *Simon, supra*, 35 Cal.4th at p. 1180 [while "conduct could be characterized as more than a single isolated incident, as the evidence showed deceptive conduct . . .  spanning several weeks, the tortious act on which liability was based was a single false promise . . . made in the letter" there was no evidence defendant had acted similarly toward other potential buyers and so conduct "did not support a high assessment of reprehensibility"].)  Given the involvement of two high ranking officers of CWG, who each independently approved or acquiesced in the termination, this factor does support an assessment of reprehensibility, although not a high assessment.

### 5. Fifth factor

The trial court made factual findings that appellants knew Lopez had cancer, Russo fired her for that reason but falsely told her she was being fired for performance based reasons, and Russo, Casar, and Yang lied about their knowledge of Lopez's cancer to cover up the wrongful termination.

Evidence that an employer offered a pretextual explanation to justify its wrongful termination may support a finding of malice or oppression.  (See *Cloud v. Casey* (1999) 76 Cal.App.4th 895, 912 [employer's use of a false explanation to hide gender-based termination supported punitive damages award]; *Stephens v. Coldwell Banker Commercial Group, Inc.* (1988)

199 Cal.App.3d 1394, 1403 [employer's fabricated criticism to justify wrongful termination supported punitive damages award], disapproved on another ground in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4.)

The court found credible Vasquez's testimony that Russo told him Lopez had cancer (demonstrating Russo's knowledge) and testimony by Marisela that she told Casar Lopez had cancer. Yang admitted he knew Lopez had a serious medical condition and it was undisputed he saw her several times a day. There was substantial evidence Lopez's physical appearance changed in a way suggesting to her coworkers that she had cancer. The court found not credible appellants' testimony that they did not know Lopez had cancer: "clearly, she was dying of cancer . . . and they lied about it and they tried to cover it up."

Appellants argue Russo, Casar and Yang were not dishonest but simply "unsophisticated in public speaking and nervous in court, [and] answered questions [about their knowledge of Lopez's cancer] at trial very literally." The trial court had ample opportunity to observe the demeanors of these witnesses and concluded otherwise. We do not reweigh credibility determinations, even when the trier of fact is making decisions under the clear and convincing standard of proof.

Appellants also contend there is no evidence that Russo viewed Lopez negatively or with malice due to her condition. Appellants ignore Lopez's testimony that Russo conveyed his unhappiness with her chemotherapy appointments, complained she was walking too slowly at work, and treated her more harshly and unfairly than the other sales representatives after she returned from medical leave. Vasquez corroborated Russo's negative comments about Lopez's slow walking; Vasquez's

24

testimony showed Russo treated Lopez more harshly than he did Vasquez.

Appellants argue the evidence shows Russo's behavior was simply an attempt to increase his department's performance due to pressure. They further claim the evidence supports Russo's claims that Lopez was performing poorly.

Russo's changing emphasis on the type of poor performance given by Lopez, as described above in the background section, undercuts his credibility. The documentary evidence, or lack of such evidence, also undermines this claim. CWG acknowledges on appeal that its own data showed Lopez had high sales numbers but then it argues the data is unreliable. Russo claimed to have run a report with orders pending in her name and went through each account to verify his impression Lopez was not performing well. He could not, however, produce documentation of this report for the court. CWG was similarly unable to produce any call logs for Lopez which would have corroborated Russo's claim that her call logs had much less detail than Vasquez's and Amaya's call logs.

We defer to the trial court's express and implied credibility findings and resolution of conflicting evidence on this topic. The court rejected Russo's testimony that Lopez was performing poorly, in part because of the lack of documentation. We find CWG did act with intentional malice and so the fifth factor is present and supports a high assessment of reprehensibility.

D. *The Punitive Damages Award Is Constitutionally Permissible Given the Reprehensibility of Appellants' Conduct and the Emotional Harm to Lopez.*

As we have just discussed, four of the factors support a high assessment of reprehensibility and one supports a

reprehensibility assessment, but not a high one. Appellants contend, correctly, that case law contains examples of more reprehensible behavior. Certainly, CWG's behavior is not the most reprehensible conduct to come before the courts. That does not mean that it is not more reprehensible than average, or put differently, at least medium high.

The trial court calculated reprehensibility as high as 80 to 90 out of 100. We note the trial court, in discussing its finding that CWG's conduct was reprehensible and deserving of punitive damages, stated: "I don't think I have ever done that as a Judge, been on the bench for ten years so it takes a lot to get me to that point and they got me there, certainly, by clear and convincing evidence."

Given the medium high level of CWG's reprehensibility, and the unusual situation where plaintiffs could not recover for Lopez's emotional distress, we have no difficulty in concluding the $500,000 is constitutionally permissible. Lopez's actual harm was in the $115,057 to $165,057 range. Taking the mid-point of $140,057 results in a multiplier of 3.5. That is not excessive in light of CWG's despicable conduct toward a seriously and ultimately terminally ill woman.

II.     ***Appellants Have Not Shown the Damages Are Excessive Under California Law.***

Appellants contend the punitive damages are excessive under California law because "the trial court's 33.3:1 ratio punitive damages award was the product of unchecked passion and prejudice, as is demonstrated above and below." As we have explained, it is the ratio between Lopez's actual harm and the punitive damages which should be considered, and that comparison yields a ratio of 3.5:1.

Any claim that appellants have demonstrated unchecked passion and prejudice apart from the ratio itself is forfeited. Appellants' vague reference to "above and below" is not sufficient to preserve the claim. (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.) Although it is not our task " 'to search the record on [our] own' " when " 'a party fails to support an argument with the necessary citations to the record' " (*Id.* at p. 1246), we note briefly that our reading of the record has not disclosed any improper passion or prejudice on the part of the trial court.

III. ***Appellants Have Forfeited Their Claim That the Trial Court Erred in Considering Holdings's Financial Condition in Assessing Punitive Damages.***

Appellants contend the trial court erred in considering the wealth of Holdings, which they describe as merely a judgment debtor. They contend only CWG was a defendant in the liability phase, and so only CWG's wealth could properly be considered in determining the amount of punitive damages. They contend, without elaboration, that "[e]lementary notions of fairness" require that a person receive "fair notice" of both the conduct that will subject him to punishment and the severity of that punishment. Alternatively and more generally they also contend that the appropriate time to measure CWG's wealth was at the time of the termination or the first trial.

Appellants fail to acknowledge that although the trial court stated it was adding Holdings as a judgment debtor at the end of the liability phase, the court did so because Holdings was an alter ego of CWG and/or its successor in interest.

As an alter ego of CWG, Holdings had notice of the liability proceedings. "Judgments are often amended to add additional judgment debtors on the grounds that a person or entity is the

27

alter ego of the original judgment debtor.  [Citations.]  This is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant.  [Citations.] 'Such a procedure is an appropriate and complete method by which to bind new individual defendants where it can be demonstrated that in their capacity as alter ego of the corporation they in fact had control of the previous litigation, and thus were virtually represented in the lawsuit.' " (*NEC Electronics Inc. v. Hurt* (1989) 208 Cal.App.3d 772, 778.)

With respect to Holdings's notice of liability for punitive damages, it is long established law in California that a corporation formed by a consolidation or merger succeeded by operation of law to all the obligations and liabilities of the constituent corporations, including liability for punitive damages. (*Moe v. Transamerica Title Ins. Co.* (1971) 21 Cal.App.3d 289, 304–305.)  The same is true for an asset purchase by a corporation which is a de facto merger.  (*Marks v. Minnesota Mining & Manufacturing Co.* (1986) 187 Cal.App.3d 1429, 1434-1435.)  More generally, a purchaser of assets has successor liability if  " '(1) there is an express or implied agreement of assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) the purchasing corporation is a mere continuation of the seller, or (4) the transfer of assets to the purchaser is for the fraudulent purpose of escaping liability

28

for the seller's debts.' " (*Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1327 (*Cleveland*).)[6]

Although appellants cite *BMW*, *State Farm,* and *Simon* for these general propositions, they make no effort to apply these propositions to a situation involving an alter ego or successor liability. We are not bound to develop appellants' arguments for them, and we "may and do 'disregard conclusory arguments that . . . fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' " (*United Grand*, *supra*, 36 Cal.App.5th at p. 153; *Hodjat, supra*, 211 Cal.App.4th at p, 10 ["appellant is required to not only cite to valid legal authority, but also explain how it applies in his case."].)

"[S]uccessor liability, like alter ego and similar principles, is an equitable doctrine. As with other equitable doctrines, 'it is appropriate to, examine successor liability issues on their own unique facts' and '[c]onsiderations of fairness and equity apply.' " (*Cleveland, supra*, 209 Cal.App.4th at p. 1330.) Given the "the factual and equitable nature of the successor liability doctrine; it is probable that no single factual element, standing alone, would establish or negate successor liability." (*Id.* at p. 1334.)

---

[6] California decisions holding that a corporation acquiring the assets of another corporation is the mere continuation of the latter require a showing that " '(1) no adequate consideration was given for the predecessor corporation's assets and made available for meeting the claims of its unsecured creditors; [and/or] (2) one or more persons were officers, directors, or stockholders of both corporations.' " (*Cleveland, supra*, 209 Cal.App.4th at p. 1327.) "[Th]e principles underlying the 'mere continuation' theory of successor liability are not confined to corporations." (*Id.* at p. 1329.)

29

Appellants have not made any legal arguments or provided relevant citations to the record to show that the trial court erred when it determined Holdings was an alter ego and/or successor of CWG. Appellants simply assert Holdings "is not the same organization as" CWG. Their only record citation is to Yang's testimony during the punitive damages phase of the trial, well after the trial court had added Holdings as a judgment debtor. As the trial court remarked when counsel began to ask questions of Yang about the relationship between CWG and Holdings during the punitive damages phase, "the record was already made, I added them on." That record, not incidentally, includes testimony by Yang during the liability phase of the trial, given *before* the trial court made its ruling adding Holdings; appellants have elected not to include the transcript of that testimony as part of the record on appeal.[7]

In adding Holdings as a judgment debtor the trial court stated "the recently named Doe defendant or defendants are merely the successor corporate entities of the now-defunct corporate defendant CIA Wheel Group. They are essentially the same exact company with a new corporate name. It would be a manifest injustice not to allow these Doe defendants to be included as a judgment debtor in this case." The trial court later

---

[7]    The court's minute orders show Yang testified on July 11, 2018. Appellants, however, have not provided this court with the reporter's transcript of the July 11, 2018, proceedings. To be clear, this is not a situation where the copy for that date has gone missing. The transcript for July 10, 2018 is labelled volume 3 of 5 and the transcript for July 19, 2018 is labelled volume 4 of 5. The designation of record filed by appellants does not designate the July 11 transcript as part of the record on appeal.

elaborated that "everything" was transferred from CWG to Holdings: "they took over all the assets in all the stores and the same management team." Based on the record on appeal, the evidence cited by the court could only have come from the testimony of Yang. The only other witnesses were Russo and Casar. Casar expressly testified that he was unaware of the ownership of Holdings; Russo was not questioned on this topic.

"We should not have to point out to counsel who should be well-versed in appellate procedure that the appellant has the burden of affirmatively demonstrating error by providing an adequate record." (*Mountain Lion Coalition v. Fish & Game Com.* (1989) 214 Cal.App.3d 1043, 1051, fn. 9.) "To the extent the record is incomplete, we construe it against [them]." (*Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 498.) Thus, we construe appellants' failure to provide a complete transcript of Yang's liability phase testimony against them, and presume it provides the overwhelming evidence referenced by the court in its ruling.[8]

---

[8] We note a few pages of Yang's July 11, 2018 testimony are found in the record on appeal. They are attached as Exhibit F to the declaration of Stacie Yee in support of appellants' motion for a new trial. Ms. Yee is currently appellants' counsel. A few more pages are found as Exhibit E to plaintiffs' opposition to the new trial motion. These brief snippets of testimony suggest the Yangs retained a great deal of control over the operations of Holdings. Yang testified his father was the CEO of CWG and then became the CEO of Holdings. During the penalty phase, Yang further testified his father was transitioning from being the CEO to being the "chairman." Yang stated his father was able to do that because "he trusts me to run the business."

31

As for appellants' claim that the financial condition of a defendant should be measured at the time of the wrongful conduct or the first trial of the matter, appellants have forfeited this claim by failing to provide any legal authority or argument to support this contention. (*United Grand, supra*, 36 Cal.App.5th at p. 146.) We note there is no logical basis to use the first trial as a basis for anything as Lopez died before the trial was complete and the court declared a mistrial. This court has certainly permitted the consideration of a defendant's financial condition at a later time than the date of the wrongful conduct. As we have explained: "In the end, '[w]hat is required is evidence of the defendant's ability to pay the damage award.' " (*Green v. Laibco, LLC* (2011) 192 Cal.App.4th 441, 453.)

## IV. *Appellants Have Forfeited Their Claims Based on Civil Code section 3294.*

Appellants contends plaintiffs did not prove either the wrongful conduct required by Civil Code section 3294, subdivision (a) or the authorization or ratification required by Civil Code section 3294, subdivision (b). A plaintiff may recover punitive damages only "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (a).) In addition, "[a]n employer shall not be liable for [punitive] damages . . . based upon acts of an employee of the employer, unless the employer . . . authorized or ratified the wrongful conduct . . . . With respect to a corporate employer, the . . . authorization, [or] ratification . . . must be on the part of an officer, director, or managing agent of the corporation." (*Id.*, subd. (b).)

32

The trial court found both requirements were met in this case, stating that "the plaintiffs have proven by clear and convincing evidence per Civil Code Section 3294[, subdivision] (b) that the corporate defendant by and through its various employees, agents, and/or management, including Russo, Casar, and Yang, terminating the decedent's employment in direct violation of public policy and that the defendant acted with malice, oppression, and/or fraud.  [¶]  Said actions were done by managing agents, and I find that Russo and Casar were managing agents, officers, and/or directors of the corporate defendant, which clearly Yang is.  Alternatively, I find that the corporate defendant has ratified and/or otherwise adopted these improper actions."

"The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt. This intermediate standard 'requires a finding of high probability.' " (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998.)

"In general, when presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1005.)  "[A]n appellate court reviewing such a finding is to view the record in the light most favorable to the judgment below; it must indulge reasonable inferences that the

33

trier of fact might have drawn from the evidence; it must accept the fact finder's resolution of conflicting evidence; and it may not insert its own views regarding the credibility of witnesses in place of the assessments conveyed by the judgment." (*Id.* at. p. 1008.)

### A. Intentional Malice (Subdivision (a))

Appellants do not make a new argument to support their claim that there is insufficient evidence of malice, fraud or oppression, but simply refer to a prior contention: "As discussed in Section I.B.5, *supra*, the record lacks substantial evidence to support a determination of clear and convincing evidence as to the issues of malice or oppression."

Our analysis and rejection of that argument is found in our discussion of the reprehensibility of appellants' conduct. There we reviewed the evidence de novo, although such a review requires deference to the court's factual findings. Appellants do not explain how or why we would reach a different result if we reviewed the record to determine if it "contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B., supra,* 9 Cal.5th at p. 1005.)

We are not required to make or develop arguments for appellants, or to speculate about which issues they intended to raise. (*United Grand, supra,* 36 Cal.App.5th at p. 153.) Simply citing general authorities on the standard of proof and appellate review is not sufficient. "[A]n appellant is required to not only cite to valid legal authority, but also explain how it applies in his case." (*Hodjat, supra,* 211 Cal.App.4th at p. 10.)

B. *Officers, Directors, Managing Agents and Ratification (Subdivision b))*

As to Civil Code section 3294, subdivision (b), appellants contend Russo and Casar were not managing agents of CWG and Casar and Yang did not authorize or ratify Lopez's wrongful termination. They contend, in effect, that Russo acted alone.

Yang was indisputably an officer of CWG, and there is evidence his permission was required and given for Lopez's termination. The trial court found Yang either acted with malice in terminating Lopez or ratified Russo's wrongful termination of her. Further, Yang was in a position to offer testimony as to whether Russo's and Casar's authority over decision-making impacted CWG policy and made them managing agents of CWG. (See *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 372–373.) As we have discussed, appellants have elected not to include a complete transcript of Yang's testimony from the liability phase when these topics were covered. We again construe the absence of this transcript against appellants, and presume it contains the necessary evidence to support the trial court's findings.

## DISPOSITION

The judgment, including the punitive damages award, is affirmed.  Costs are awarded to respondents.

**CERTIFIED FOR PUBLICATION**


STRATTON, J.

We concur:



BIGELOW, P. J.



WILEY, J.